174 So.2d 804

**In re C. P. LaFITTE Applying for Adoption.**

**No. 47571.**

May 3, 1965.

Joseph R. Bethard, Shreveport, for plaintiff-appellee-applicant.

Booth, Lockard, Jack, Pleasant & Le-Sage, James J. Thornton, Jr., Shreveport, for opponent-appellant-respondent.

FOURNET, Chief Justice.

C. P. LaFitte, availing himself of the provisions of R.S. 9:422.1 [1] and joined by his wife, instituted this proceeding to adopt his three minor step-children—Pamela Gayle, James Clifford, II, and Sharon Minette Hutchinson, ages 15, 12, and 10 respectively, whose care, custody, and control had been awarded their mother—without the consent of their father, James

---

1. The pertinent provisions of this section, as amended by Act No. 106 of 1962, in so far as it permits a step-parent to adopt step-children, are as follows: "If the spouse of the petitioner is the legitimate parent of the child * * * then the consent of the other legitimate parent is not necessary if the first and second * * * conditions exist: (1) The spouse of the petitioner * * * [has] been granted custody of the child by a court of competent jurisdiction and (2) The other legitimate parent has refused or failed to comply with a court order of support for a period of one year * * *." (R.S. 9:422 was previously amended by Acts 501 of 1958 and 268 of 1960.)

Clifford Hutchinson, claiming Hutchinson, by failing to fulfill his parental responsibilities to these minors for a period exceeding a year in accordance with the obligation imposed upon him by the judgment of the district court awarding his former wife a divorce against him on December 16, 1958, had forfeited his parental rights.

In opposing the adoption, Hutchinson admitted his failure to make any payments of alimony between October 1962 and December 1963, asserting that inasmuch as the children had been removed from the jurisdiction of the court and taken to the Philippine Islands, a foreign country, making it impossible for him to exercise his visitation rights, he was relieved of the obligation of making these payments; further, that no protest was ever made by his former wife over his failure to make such payments, and, in fact, when he learned she and the children had returned, he tendered the full amount of all payments for child support not previously made.[2]

This matter is now before us on a writ of certiorari granted on LaFitte's application in order that we might review the judgment of the Court of Appeal for the Second Circuit reversing the judgment of the district court authorizing the adoption of the children by the step-father, based on that court's conclusion Hutchinson's failure to pay child support alimony for a period in excess of a year was without just cause. See, 168 So.2d 837.

In its opinion the appellate court pointed out that prior to the amendment of R.S. 9:422 adoption without the consent of both parents was not allowed in this state, and recognized that inasmuch as such statutes are "in derogation of the natural rights of a legitimate parent to the child and of the rights of the child to the parent," they have long been strictly construed in the jurisprudence in favor of the parent; consequently, since R.S. 9:422 was amended because of the decision in Madere v. Long, 231 La. 498, 91 So.2d 771,[3] which had refused to permit the adoption where

2. From the amount of this check—$1,516 —it is obvious Hutchinson's calculation of back alimony payments exceeded the 14 months elapsing between October 1962 and December 1963, thus reflecting his recognition of the fact he had been derelict in making alimony payments even previous to this 14-month period.

3. The Madere decision was handed down in 1958. In 1958, by Act No. 501, the legislature amended R.S. 9:422 to permit a step-parent to adopt children where the legitimate parent refused or failed to

comply with a court order for support for a period of 3 years or more. Act No. 268 of 1960 further amended this section to reduce the period of non-payment to 1 year, and also to extend the privilege of adoption to grandparents awarded child custody. The 1962 amendment, in addition to providing a severability clause, also reworded the first condition and added a third, the latter dealing with a legitimate parent who is a non-resident.

the consent of the legitimate father had not been obtained, by stipulating children can be adopted by a step-parent without the consent of both parents where the spouse of such step-parent is the legitimate parent of the child and has been awarded its custody by a court of competent jurisdiction, provided the "other parent has refused or failed to comply with a court order of support for a period of one year," the rule of strict construction must be applied here.

In our recent decision in In re Ackenhausen, 244 La. 730, 154 So.2d 380, in determining the effect of the amendments to R.S. 9:422 and their proper application, we said: "We think the legislature * * was attempting to define the conduct which would be a failure of the parent to fulfill his responsibility of support of his child, whereby the parent would forfeit his parental rights," and the only time consent of both parents is not needed is "when the failure to comply with the order of the court is *without just cause.*" "The legislature never intended by this provision to dispense with consent where the legitimate parent shows that his failure to comply with the court order for support was *for reasons beyond his control.*" However, in this same decision we emphasized that *"we do not propose to give the statute such a strict interpretation as to make it ineffective and inoperative,"* and that "To hold that under the statute there must be

a complete refusal or failure to pay any sum whatever for one year before consent would be dispensed with would be to disregard completely the obligation which a parent has to provide support and maintenance for his child." (The emphasis has been supplied.)

It is apt to observe here that Hutchinson does not claim his failure to comply with the court's order for support of his children was due to *"reasons beyond his control."* In his answer he specifically set out that his reason for not making these payments was due to the fact he thought he was relieved of this obligation because of the removal of the children from the court's jurisdiction to a foreign country where he could not exercise his visitation rights. Yet, as pointed out by the learned trial judge in his reasons for authorizing the adoption without the consent of Hutchinson, he "apparently made no issue of the effect of this absence on his obligation in December of 1961 when Mr. LaFitte was back in the United States and contacted him about the past due payments. He continued to make payments in 1962 until October or November, during all of which time the children were in the Philippine Islands."

■ From our appreciation of the evidence and facts of this case, we conclude, as did the trial judge, that Hutchinson's failure to comply with the district court's

order of support for his children for a period exceeding one year was without just cause, and he thereby forfeited his parental rights; consequently, under the specific provisions of R.S. 9:422.1, his consent to the adoption of the subject children is not necessary. In re Ackenhausen, supra.

We think this case and the Ackenhausen case are, in all material aspects, factually similar. In both cases the step-father of the children was supporting them during the period in which the fathers failed to pay child support, so that in neither case were the children in actual need because of their neglect and failure to comply with the court orders fixing the amount they were to pay as alimony for the maintenance of their children. Neither Ackenhausen nor Hutchinson assigned as an excuse for this failure to pay for the care of their children that this was due to reasons beyond their control. While Ackenhausen gave as his reason failing to pay child support his unemployment during a part of the year, he did make a token payment of $50 during this period and claimed to have given his children gifts of such value as to approximate the amount of the alimony due. We held this was insufficient to preserve his parental rights.

Hutchinson, on the other hand, admitted he was fully employed, had not been ill or lost time from work during the entire 14 months he failed to make any contribution to the support of his children.[4] While he, as had Ackenhausen, professed great love and affection for his children, the record discloses he remarried within a few days after his wife secured the divorce against him on December 16, 1958, and, as will be shown later, his alimony payments were not made in varying amounts with the regularity indicated by the Court of Appeal in its opinion. Further, the contributions to his children during this 14-month period in the way of gifts and cash were of a comparatively minor value and given principally as birthday and Christmas presents. Yet it was established that during this period of non-payment he had a savings account in excess of $800, just as Ackenhausen had one in excess of $900 during the 12 months he failed to contribute to the support of his children.

Hutchinson's claim he should not be deprived of his parental rights for failing to make payments during this 14-month period because he tendered payment of all past due alimony prior to the institution of the instant proceeding, and particularly since his former wife never protested his failure to promptly pay alimony support for his children, is without merit, and not supported by the evidence.

4. Hutchinson's salary was $440 a month, and he also had a monthly travel allowance of $70.

■ We think, as did our learned brother below, that *"If it were possible to pay up an arrearage in the twelfth month of each year and thereby defeat each effort of the adoptive step-parent to adopt children he is attempting to be a father to, the intent of the legislature in adopting R.S. 9:-422.1 would surely be defeated."* (The emphasis has been supplied.)

■ Moreover, the trial judge obviously did not believe Hutchinson's testimony that he had, on the advice of his attorney, mailed to Mrs. LaFitte on December 30, 1963,[5] (the carbon copy of the accompanying letter is in evidence and shows it was dated December 29), a check in the amount of $1516, calculated by him to be the amount he then owed for all back alimony, and, from our perusal of the evidence, we have reached the same conclusion. Mrs. La-Fitte emphatically denied receiving any such letter or check.

If Hutchinson had, in fact, mailed such a letter at 11:00 p. m., on the night of December 30, 1963, as he and his wife testified, it is difficult to understand why he would have gone to the bank the very next morning, as stated by his witness John E. Craig, an official of the bank on which the check was drawn, to find out if the check had cleared, telling Craig it was "way past due on getting back to the bank and he was concerned as to whether it had been lost or not." Furthermore, although Hutchinson claimed to have stopped payment on the $1516 check and secured a bank money order on January 7, 1964, on advice of his attorney, according to Mr. Craig Hutchinson returned to the bank on that day expressing fear the $1516 check had been lost since it still had not come through, and asked Craig what to do about it; and it was upon this banker's advice payment on the $1516 check was stopped and a bank money order obtained for $1591,[6] which money order Hutchinson took to his attorney and he (the attorney) later that day sent it by certified mail to Mrs. LaFitte, she receiving it the next day. It may be apt to observe here that the check was sequestered in her hands under a supplemental answer filed by Hutchinson in which he prayed this money order be held in the court's custody "until final disposition of this trial and all appeals." In still another pleading, filed the day judgment was rendered, Hutchinson prayed this money order

5. Hutchinson's wife testified he did not consult an attorney until after Mrs. La-Fitte over the telephone refused him permission to see the children. This was on January 6, 1964, the day this proceeding was filed.

6. The difference between the check and money order represents alimony for an additional month.

be returned to him in the event of an adverse judgment.[7]

Hutchinson's testimony as a whole is very unimpressive. When the trial judge repeatedly sought to elicit from him information as to why he consulted an attorney, particularly one he had never before employed, prior to ascertaining whether his former wife would permit him to see the children, as he had testified, he was most evasive. His first answer was he heard Mr. Whitfield Jack was an exceptionally good lawyer and he figured he was going to need one. Another time he answered: "Well, I anticipated this thing was coming up," and, in answer to the court's question as to what it was he anticipated, he said: "That it may be some discussion about this child support. I was confused. I did not really know' what to do or what—to do about the thing. I didn't know exactly where I stood on it." Still later he said the reason he consulted an attorney was not in anticipation of trouble, as just testified to, but was prompted by "a desire to see the children." When pressed still further by the judge for his real reason for

7. In his written reasons the trial judge remarked: "Although the question of the disposition of the sequestered check is not before the court at this time, this court is of the opinion that the children are entitled to that portion which their father may be found to have actually owed at the time he made the attempted

consulting an attorney before he even asked Mrs. LaFitte if he could see the children, he said he did not know where to contact her, claiming he secured her address from her sister, although he had previously testified he had secured his former wife's address from her sister in order to properly address the letter purportedly mailed on December 30 transmitting the $1516 check. Significantly, according to Mrs. Hutchinson, her husband did not go to see Mr. Jack and consult him until Mrs. LaFitte refused to permit Hutchinson to see the children, which was on January 6, 1964, the very day these proceedings were filed.

We also find untenable Hutchinson's contention he should not be deprived of his parental rights because his former wife never protested his failure to promptly pay the child support alimony. The record reveals Hutchinson had to be coerced from time to time to make the alimony payments ordered by the court for the support of his children. Mrs. LaFitte testified that from the beginning and up until the summer of 1960 she had to constantly "prod"

payment in January 1964, unless under the circumstances Mr. and Mrs. LaFitte desire to refund this money to Mr. and Mrs. Hutchinson." Inasmuch, therefore, as this was not passed on by the trial judge, it is not now before us for consideration.

Hutchinson into making alimony payments, and that at that time he was over $500 in arrears, compelling her to finally resort to compulsory process to collect it. Then, by agreement, her former husband was permitted to liquidate this amount at the rate of $10 a month, making his monthly alimony payments thereafter $85. She further testified this obligation has never been fully liquidated, and that she made no further demands on him for child support after a check for $255, representing back alimony for three months and sent to her while in the Philippines, failed to clear the bank because her previous demands had been ignored and she felt further efforts on her part to have him meet this obligation would be futile. In fact, the amount of $255 represented by this "hot" check was never paid until Mr. LaFitte, returning to the states in the latter part of December 1961, secured the amount through Mrs. LaFitte's attorney from Hutchinson.

For the reasons assigned, the judgment of the Court of Appeal for the Second Circuit is reversed and the judgment of the Twenty-sixth Judicial District, in and for the Parish of Bossier, be, and it is hereby, affirmed.

HAMITER, J., dissents, being of the opinion that the judgment of the Court of Appeal is correct.

175 So.2d 108