240 So.2d 46 (1970)
In re Lawrence Joseph GENIN, Applying for Adoption of Denine Elizabeth Schiavone, a Child Under 17 Years of Age.
No. 4055.
Court of Appeal of Louisiana, Fourth Circuit.
October 5, 1970.
*47 Ralph L. Barnett and Lawrence J. Genin, Gretna, for plaintiff-appellee.
Clarence O. Dupuy, New Orleans, for respondent-appellant.
Before BARNETTE, LeSUEUR and SWIFT, JJ.
SWIFT, Judge.
Petitioner, Lawrence Joseph Genin, filed this proceeding endeavoring to adopt his step-daughter, Denine Elizabeth Schiavone, the then four year old child of his wife, Jacqueline Ann Genin, and her former husband, Frank Schiavone, a non-resident of the State of Louisiana. A curator ad hoc was appointed to represent Mr. Schiavone. However, he obtained his own counsel, and answered opposing the petitioner's prayer for adoption of his daughter.
Judgment was rendered granting the adoption as prayed for and ordering the name of the child changed to Denine Elizabeth Genin. Frank Schiavone has prosecuted this appeal from that judgment.
Mr. Genin contends that he is entitled to adopt the child, despite Mr. Schiavone's opposition, under sections (1) and (3) of LSA-R.S. 9:422.1 which reads as follows:
"If the spouse of the petitioner is the legitimate parent of the child or if the petitioner is the grandparent or grandparents of the child, then the consent of the other legitimate parent is not necessary if the first and second or the first and third conditions exist:
"(1) The spouse of the petitioner or the grandparent or grandparents or the mother or the father have been granted custody of the child by a court of competent jurisdiction and
"(2) The other legitimate parent has refused or failed to comply with a court order of support for a period of one year or
"(3) The other legitimate parent is a non resident of this state and has failed to support the child for a period of one year after judgment awarding custody to the mother or father or grandparent or grandparents."
Mr. Schiavone denies that he has failed to support Denine for a period of one year, and contends also that his wife has prevented him from providing continuous support and visiting with the child by refusing *48 to cash his checks and concealing her whereabouts.
Adoption is a creature of statutory law, and being in derogation of the natural right of a parent to his or her child such statutes are always strictly construed in favor of the parent. See Roy v. Speer, 249 La. 1034, 192 So.2d 554 (1966) for a review of the history of adoption legislation, including the above statute, and the jurisprudence. Suffice it to say, our courts have consistently recognized the sacred relationship that exists between a parent and child and have severed same with extreme reluctance. The consent of both parents is required before an adoption will be decreed, except in those instances where parental consent has been specifically dispensed with by law. LSA-R.S. 9:422.1 falls in this category, and in regard to its interpretation our Supreme Court has said:
"In our recent decision in In re Ackenhausen, 244 La. 730, 154 So.2d 380, in determining the effect of the amendments to R.S. 9:422 and their proper application, we said: `We think the legislature * * * was attempting to define the conduct which would be a failure of the parent to fulfill his responsibility of support of his child, whereby the parent would forfeit his parental rights,' and the only time consent of both parents is not needed is `when the failure to comply with the order of the court is without just cause.' `The legislature never intended by this provision to dispense with consent where the legitimate parent shows that his failure to comply with the court order for support was for reasons beyond his control.' However, in this same decision we emphasized that `we do not propose to give the statute such a strict interpretation as to make it ineffective and inoperative,' and that `To hold that under the statute there must be a complete refusal or failure to pay any sum whatever for one year before consent would be dispensed with would be to disregard completely the obligation which a parent has to provide support and maintenance for his child.' (The emphasis has been supplied.)" In re LaFitte, 247 La. 856, 174 So.2d 804, 806 (1965).
Whether a parent has failed in his responsibility to furnish support under this statute, of course, depends on the facts of each case. In both Ackenhausen and La-Fitte the court concluded that the fathers' failure and refusal to comply with their respective orders for support were without excuse and just cause. The same conclusion was reached under the facts involved in In re Adoption of Moody, 201 So.2d 222 (La.App. 2 Cir. 1967).
Other cases refusing to grant adoption decrees without the consent of the natural parent where the failure to support the child was based on just cause or reasons beyond his or her control are In re Hughes, 176 So.2d 158 (La.App. 4 Cir. 1965); In re Adoption of Bickerstaff, 190 So.2d 117 (La.App. 4 Cir. 1966); In re Adoption of Schieman, 204 So.2d 433 (La.App. 4 Cir. 1967); In re Spraggins, 234 So.2d 462 (La. App. 1 Cir. 1970).
Thus, we must determine (1) whether or not Mr. Schiavone has failed to support Denine Elizabeth Schiavone for a period of one year after the judgment awarding custody to her mother; and if so, (2) whether or not his failure to furnish such support was without just cause or for reasons beyond his control.
The record discloses that Jacqueline Ann Genin and Frank Schiavone separated in March, 1965, and were divorced on April 25, 1967. The custody of Denine Elizabeth Schiavone, the only child born of their marriage, was granted to Mrs. Genin. The decree contained no provision for child support or alimony. Mr. Schiavone is and has been a non-resident of Louisiana since his separation from Mrs. Genin. Lawrence Joseph Genin married Mrs. Genin on June 17, 1967, and her daughter has resided in their home since that time. Mrs. Genin *49 has agreed to the adoption of her daughter by the petitioner.
Mr. Genin testified that he has supported Denine since his marriage to her mother in June of 1967. He said that between April 25, 1967, and March 20, 1969, when this proceeding was filed, Schiavone sent approximately $60.00 for the support of his daughter in checks of $10.00 or $11.00 each. In June, 1968, following a rather serious illness of Denine, he talked to Schiavone over the telephone and requested financial assistance. The latter informed him that he had the child and could support her, but that he had a hospitalization insurance policy which might or might not cover Denine. Petitioner wrote Schiavone for the identity of the insurance company, but received no response. He explained that he did not send the medical bills to Schiavone, because he had paid the bills himself and he wanted the name of the company in order to make a claim for his own reimbursement. Genin denied that he or his wife concealed their whereabouts from Schiavone at any time or interfered in any way with Schiavone's visitation with his daughter. He pointed out that his name and address were listed in the New Orleans telephone directory. Additionally, his mother-in-law and father-in-law resided continuously at the same address at which they lived prior to Schiavone's divorce and that Mrs. Genin resided there with Denine until her marriage to Genin.
Jacqueline Genin corroborated her husband's testimony that she and Denine lived with her mother and father from the time of her separation from Schiavone in 1965 until their marriage on June 17, 1967. Thereafter, she and her daughter resided with Genin, whose name and address were always listed in the New Orleans telephone directory. She testified that her parents had supported her child between the time of her separation and her remarriage, but admitted she had received some checks from Schiavone of which no record was kept. She denied ever refusing support from him or tearing up or refusing to cash his checks. She further denied placing any obstacle in the path of his seeing their daughter. Mrs. Genin said that Mr. Schiavone did not ask her to see the child at any time, and there has been no contact between them since her remarriage and the filing of this proceeding. She has not received any letters from him inquiring as to Denine's health, welfare or needs. Mrs. Genin contended that Genin had supported her daughter since their marriage, but acknowledged that she was earning $300.00 a month when she quit her job a few months prior to filing this suit, and this was also used to pay the family's expenses. When shown Schiavone's check stubs indicating checks were made payable to her for the baby dated March 22 and April 1, 1968, she could not say whether or not she had received same. She remembered getting only two checks between March 20, 1968, and March 20, 1969, for $11.00 each, one dated April 11, 1968, and the other April 23, 1968. The latter was returned to her because of insufficient funds in the account. She acknowledged Schiavone had paid support regularly since this adoption proceeding was filed. Mrs. Genin wanted Schiavone to support her child and asked him to do so in a conversation at her mother's sometime in 1966 and also in a subsequent telephone call. However, she did not write him about this. She explained that court proceedings for support were not filed on the advice of her attorney; that because Schiavone was a nonresident such action would be of no avail. She did not notify Schiavone of Denine's illness, nor did she instruct anyone else to notify him. She did not tell him about the medical bills or mail them to him, but said her husband took care of this through a letter to Schiavone requesting the address of the insurance company for the purpose of obtaining medical benefits for their daughter. She denied they ever received this information. Mrs. Genin also stated that she has never sent bills to Schiavone for clothes for Denine or other necessities.
*50 Mrs. Keller testified that her daughter and Denine lived at the Keller residence until her remarriage. Denine also stayed at her house many days and some nights thereafter as Mrs. Keller kept the child during her daughter's working hours until she left her job around the first part of 1969. Denine was therefore at the Keller home on most occasions when Mr. Schiavone came to visit. She said that neither of the Genins ever instructed her to refuse permission for Schiavone to see his child, and she always permitted him to do so in spite of the fact that he seldom notified her in advance that he was coming. On one occasion when the child was with the Genins Schiavone requested Mrs. Keller to call her daughter and get permission for him to take her to a shopping center. She was unwilling to do so, and suggested he speak to them himself as she was reluctant to get involved in their affairs. She said that Schiavone was always welcome at her home. She never refused to accept or to forward mail sent by him to her daughter, nor did she ever refuse phone calls from him. Mrs. Keller was positive that she informed Schiavone of Genin's correct name about the time of his marriage to her daughter. She did not give him Genin's address, but it was in the phone book. She acknowledged Schiavone had inquired if there was anything his daughter needed and the size of her clothing, but such inquiries were related to gifts for Christmas or Easter. Mrs. Keller did not recall her daughter's ever seeking assistance from Schiavone. She did not notify him of the child's illness in 1967. To her knowledge Schiavone sent gifts and about ten $25.00 government bonds to Denine at Christmas, Easter and on her birthday. Mrs. Keller did not recall Schiavone's ever telling her that Mrs. Genin was not cashing any of the checks he sent for child support. She denied that Bonin, Schiavone's friend, had ever asked her if Denine needed anything.
Oscar William Keller, father of Mrs. Genin, corroborated the testimony of his wife that no obstacles were ever placed in the path of Schiavone's seeing his daughter. He testified that he had supported his grand-daughter prior to Mrs. Genin's marriage and that she and Denine lived in his home. Mrs. Genin worked during this time. Mr. Keller said he was never instructed to refuse Schiavone the right to see the child, and neither the Kellers nor the Genins ever attempted to conceal the whereabouts of Denine from him. He was unaware of any efforts of his daughter to obtain support from Schiavone, but thought she would have taken the money. He did not dislike Schiavone and said he could come to their home any time he wished.
Frank Schiavone testified that he resided with his wife and his daughter in the home of his mother-in-law for approximately eight months prior to his separation at which time he moved to Philadelphia where he was living at the time of the trial. He has worked for the same employer since August, 1966, and his earnings are now $150.00 per week. He first learned of his divorce and also his wife's second marriage in June, 1967. Schiavone said he asked his mother-in-law who her daughter had married and she informed him only that his name was Spain. (Apparently, this is Mr. Genin's nickname.) It was not until 1968 that he learned his name was Larry Genin. Schiavone did not recall making any other inquiry to discover his identity, however. He produced 37 cancelled checks payable to Jackie Schiavone, which were sent as support for the child. Ten of these aggregating $105.00 were drawn by his father or mother between the dates of March 25 and July 6, 1965. The others were issued by Schiavone between July 12, 1965, and March 22, 1967, and totalled $285.00. All but two of the checks were in the amount of $10.00. He insisted that between January and July, 1967, he sent checks every week for the support of his child, all but two of which were never cashed and returned to him. Because of this no checks were sent during the period from July, 1967, until January, 1968. He had not kept a special account of the checks, *51 and had lost some of his bank statements, cancelled checks and check stubs. His banks wrote him they could not furnish copies of his records in time for the trial. Four checks that were cashed in 1968 were introduced into evidence. They were dated January 30, 1968, February 8, 1968, February 14, 1968, and April 11, 1968, and totalled $43.00. Another for $11.00 dated April 23, 1968, bears the notation "N.S.F." Schiavone stated that he mailed other checks in 1968, but again he discontinued sending them after July, 1968, because they were not being cashed. After notification of the filing of the adoption proceedings he resumed mailing the checks to the home of Mrs. Keller, although he was then aware of Mrs. Genin's address. He sent 10 to 13 $25.00 government bonds to Denine, each bearing the restriction that they could not be cashed until his daughter was 18 years of age and if she died prior to that time the proceeds of the bonds would belong to Schiavone. He said he visited Gretna to see his child in February and July of 1966, June of 1967, February and June of 1968 and in February 1969, but was not able to see her except on the 1966 visits. (When originally called by petitioner to testify on cross-examination, however, Schiavone said he also saw Denine in June, 1967.) He was in New Orleans for about thirteen days of 1969 and visited the Keller home twice, but he said the child was not there. He also went to Mr. Genin's office at the latter's request and was informed of the proposed adoption. Schiavone told him he would have to consider the matter further before he could give his consent. He said he asked Genin to let him see the child, but the latter did not phone to give him permission and he did not call the Genins about this. Mr. Schiavone said he has insurance with the Amalgamated Clothing Workers of America Union which covers Denine's hospitalization and also a scholarship for college, and that he advised Mrs. Keller and the Genins of the policy in June of 1968. He contended his shop steward mailed a letter to Genin advising that Denine was covered under the policy and asking for the bills. However, Genin did not send Denine's medical bills to him or to his Union, and he was not permitted to pay the bills. He stated that he loves the child and will never agree to her adoption by anyone including Genin, and he expressed his desire to support Denine. He testified that he had called a Mr. Wilson Bonin, who was the only friend that he had in New Orleans, for the purpose of obtaining information as to his daughter's welfare. He insisted that he had attempted to discuss the support of his child with both Mrs. Keller and Mrs. Genin to no avail.
Mrs. Frank Schiavone testified that when she came to New Orleans in 1969 to visit Denine, she and Schiavone visited the Keller home on two occasions but were unable to see the child or to obtain information about her. She stated that before leaving New Orleans, they were called by Larry Genin, and the adoption of Denine was discussed at his office. He was later advised by letter that Schiavone would not consent thereto.
Edward Gwardyak testified that in July, 1966, he visited New Orleans with Schiavone. At this time Schiavone attempted to make an arrangement for support of the child but Mrs. Genin did not give him a definite answer. He stated that on this trip Schiavone saw his child twice.
Wilson Bonin testified that at Schiavone's request he called Mrs. Genin on two or three occasions to inquire about Denine and her needs, but was informed by her that the baby was all right and needed nothing. He stated that he had also called Mrs. Keller for the same purpose and was informed that she was fine. He corroborated Schiavone's testimony that he had made visits to New Orleans to see his child and that he had gone to the Keller home for that purpose several times. Bonin accompanied him on two occasions, and said they did not see the child on their visit in June or July, 1966, but did see her when they went to the Keller home in July, 1967.
*52 Included in the record under LSA-Louisiana Code of Civil Procedure Article 1636 are certain check stubs of Mr. Schiavone which purport to show that he issued a $10.00 check to Mrs. Genin on January 30, 1968, and checks for $11.00 each on February 9, 14, 23, 29, March 8, 22, April 1, 11 and 23rd, 1968. An objection to their admissibility in evidence was sustained by the trial judge under LSA-C.C. Article 2249 providing that domestic books and papers are not proof in favor of the one who has written them. This ruling was correct. Although they could be used by the witness to refresh his memory and testify that he wrote such checks, as was done by Mr. Schiavone in this case, the documents themselves were inadmissible. Kendall v. Bean, 12 Rob. 407 (1846); Succession of Gross, 23 La.Ann. 105 (1871); Brown v. Pike, 34 La.Ann. 576 (1882); Istrouma Mercantile Co. v. Northern Assur. Co., 183 La. 855, 165 So. 11 (1935); Williams v. Simon, 165 So. 328 (La.App.Orl. 1936).
It readily can be seen that there was a sharp conflict in the testimony of Mr. Genin and Mr. Schiavone and some of their respective witnesses in regard to the amount of support which he provided for his child and whether or not Mrs. Genin concealed her whereabouts and prevented visitation by the father. It is evident that the trial judge was more impressed by and gave more weight to the testimony of the Genins and Kellers than that of Schiavone in these respects, and from our review of the record we fully agree.
In regard to Mr. Schiavone's testimony that he sent many support checks that were not cashed by Mrs. Genin and therefore could not be produced, it is difficult to understand why this mother would accept some of the support payments and not others and also why she would accept war bonds and gifts for the child but not some support checks. In view of the interest which he professed to have in Denine and her welfare, it is incredible that her father never wrote or called Mr. or Mrs. Keller or Mrs. Genin to inquire whether the lost checks had been received and what had happened to them. How he could have maintained any semblance of balance of his checking account under such circumstances is beyond comprehension. Like the trial judge, this court is not impressed with Mr. Schiavone's testimony that many of his support checks were not cashed by the child's mother, and we cannot accept his contention that this was just cause for his admitted failure to provide any support for his child from July, 1967, until January, 1968, and from July, 1968, until March, 1969. If he was sincere in his belief in July, 1967, that Mrs. Genin did not want him to support the child, was concealing her whereabouts and was not going to let him visit with her anymore, there is no plausible reason for his sending the checks dated January 30, February 8, February 14, April 11 and April 23, 1968, which were produced and admitted in evidence. The preponderance of the evidence is to the effect that these were the only support payments made by Schiavone from March 22, 1967, up to the time this proceeding was filed on March 20, 1969, and after deducting the N.S.F. check aggregated $43.00. Thus, the proof reflects that the only payment made by the father during the year immediately preceding the filing of this petition was the check for $11.00 dated April 11, 1968. Even if we could accept Mr. Schiavone's testimony that he also sent checks dated March 22 and April 1, 1968, which he said were reflected in his check stubs and not returned to him, he still would have contributed only $33.00 for the support of his child during this one year period. As in Ackenhausen, payment of such an insignificant amount within the year could not possibly be considered as adequate or reasonable support within the intendment of LSA-R.S. 9:422.1.
We therefore conclude that the conditions set forth in Sections 1 and 3 of this statute exist in the present case.
*53 We must also determine, however, whether or not Mr. Schiavone's failure to pay support was without just cause or for reasons beyond his control. Unlike the father in Hughes, Mr. Schiavone was financially able to contribute to the support of his child at all times and most certainly after he went to work for his present employer in 1966. Aside from his contention that the continuance of support payments would have been useless because Mrs. Genin was not cashing his checks, which we are unable to accept for the reasons pointed out above, the only other excuse advanced for failing to furnish support for the year preceding this adoption proceeding was that Mrs. Genin placed obstacles in his way and prevented him from visiting with his child. This contention is likewise without merit. Although it is clear from the record that her attitude was one of complete indifference and unquestionably she took no affirmative action to further Schiavone's visitation with Denine, certainly there is nothing in this record which indicates that either Mr. or Mrs. Genin or Mr. or Mrs. Keller concealed the child's whereabouts from her father at any time. Mr. Schiavone knew where the child resided prior to her mother's marriage to petitioner and he could have easily ascertained the address of her residence thereafter from the telephone book. We are convinced he either knew or could have obtained Mr. Genin's full name from Mr. or Mrs. Keller at that time. Unlike Hughes, the evidence in this case does not establish any attempt at concealment of the child's whereabouts, nor does it appear that this father took any positive action with respect to visitation except to go by the Keller residence when he visited in New Orleans. At best from Schiavone's standpoint, like the father in Moody, he failed to make support payments for no other reason than he thought he was being denied visitation rights, which is not an adequate excuse.
We therefore conclude that the consent of Frank Schiavone to this adoption is unnecessary, because of the applicability of LSA-R.S. 9:422.1(1) and (3). We further conclude, as did the trial judge, that the adoption of Denine Elizabeth Schiavone by Lawrence Joseph Genin is in the best interests of the child.
For the foregoing reasons the judgment of the lower court is affirmed at appellant's cost.
Affirmed.