176 So.2d 158 (1965)
In re J. A. HUGHES Applying for Adoption.
No. 1837.
Court of Appeal of Louisiana. Fourth Circuit.
June 7, 1965.
*159 Gaudin & Edwards, Robert D. Edwards, Gretna, for John E. Skeen, Jr., appellant.
No appearance for J. A. Hughes, appellee.
Before YARRUT, SAMUEL and BARNETTE, JJ.
CHRIS T. BARNETTE, Judge pro tem.
This began as a proceeding for adoption of two children under seventeen years of age by their step-father, J. A. Hughes, but while pending, was dismissed as to one of them. The children in question are the children of petitioner's wife by a former marriage to John E. Skeen, Jr. After being notified of the proposed adoption, John E. Skeen, Jr., father of the children, appeared and vigorously opposed the adoption. Proceedings were dismissed as to the older child, Kenneth Eugene Skeen. From a judgment of the Juvenile Court for Jefferson Parish granting adoption of the child Janet Marie Skeen as prayed for, her natural father, opponent, has appealed.
After the appeal had been lodged in this Court, counsel of record for Mr. Hughes, appellee, on March 5, 1965, filed a motion and obtained an order of this Court to withdraw as counsel upon the allegation that J. A. Hughes, appellee, had "requested and directed your Mover not to pursue this matter on appeal and that he does not desire your Mover to further represent him in these proceedings". Whereupon, J. A. Hughes, appellee, was notified of continuance of argument in this Court from April 6 to May 7, in order that he might have sufficient time to secure other counsel.
When the case was called for argument, the appellee made no appearance either through counsel or in person, and no brief has been filed in his behalf. Mrs. Hughes, his wife, mother of the child subject of this proceeding, appeared in person; and though she is not, strictly speaking, a party to this proceeding, for she is neither the petitioner nor opponent, this Court, without objection of appellant, granted her the courtesy of a hearing. When the case was called for argument before us, counsel for appellant offered to continue the case to allow further time for appellee to obtain counsel and offered on behalf of appellant to pay such counsel's fee. Mrs. Hughes declined the offer. We think it is significant that Mr. Hughes has shown so little concern about this appeal; and the personal appearance of his wife in this Court lends credence to our belief that it is she, more than Mr. Hughes, who desires the adoption.
The judgment granting the adoption was entered over the protest of the natural father of the child on authority of LSA-R.S. 9:422.1 which reads as follows:
"If the spouse of the petitioner is the legitimate parent of the child or if the petitioner is the grandparent or grandparents of the child, then the consent of the other legitimate parent is not necessary if the first and second or the first and third conditions exist:
"(1) The spouse of the petitioner or the grandparent or grandparents or the mother or the father have been granted custody of the child by a court of competent jurisdiction and
"(2) The other legitimate parent has refused or failed to comply with a court order of support for a period of one year or
"(3) The other legitimate parent is a nonresident of this state and has failed to support the child for a period of one year after judgment awarding custody to the mother or father or grandparent or grandparents. Added *160 Acts 1958, No. 501, § 1, as amended Acts 1960, No. 268, § 1; Acts 1962, No. 106, § 1."
John E. Skeen, Jr., and Marie Driggers Skeen were divorced in Harris County, Texas, August 22, 1949. Of their marriage two children were born; namely, Kenneth Eugene Skeen, July 5, 1947, and Janet Marie Skeen, September 1, 1948. Mrs. Skeen (now Mrs. Hughes) was awarded custody of the two children subject to visitation rights of the father; and Mr. Skeen was ordered by the court to pay $20 weekly for their support, payments to be made through the Probation Department of Harris County. He made payments during the balance of 1949 and the years 1950, 1951, and 1952, aggregating $980. Nothing more was paid until after the adoption proceeding was instituted. On July 17, 1964, while the adoption was pending, Mr. Skeen paid direct to Mrs. Hughes $3,120 "in full settlement of all past due child support", acknowledgment and receipt of which was signed by Mrs. Hughes and is filed in the record. The total arrearage was about $14,000.
Shortly after their divorce Mr. Skeen remarried; and in October, 1952, Mrs. Skeen married the petitioner, appellee J. A. Hughes, and moved from Houston to Lafayette, Louisiana.
Soon after Mr. Skeen's remarriage, his second wife became ill with tuberculosis, and it became necessary for him to leave Houston to provide hospital care for her in Denver where they remained a little over a year. During this time Mr. Skeen secured work as a plumber's helper at $1.20 per hour. During his sojourn in Denver his parents in Houston made some payments of child support for him. Apparently he personally made no payments during this period which he attributes to his low wages and expenses incident to his wife's illness.
Then, after his return to Houston from Denver, Mr. Skeen suffered a serious back injury, was hospitalized, and was more than a year in recovery. He testified that he had to learn to walk again. During the next three years, 1950-52, his work and payments were irregular and payments aggregated $980 from the date of divorce. After that no further payments were made.
We are convinced from the testimony that Mrs. Hughes sought diligently to keep her whereabouts unknown to Mr. Skeen. She strongly opposed his having any contact with his children, which she seeks to justify by the fact that he had not paid the child support as ordered and that his visits to the children were upsetting emotionally.
The testimony reveals a characteristic attitude of vindictiveness on the part of Mrs. Hughes toward Mr. Skeen, and Mr. Skeen frankly admits that he was very much at fault and his former wife was justified in divorcing him. The record also reveals that Mr. Skeen since learning the whereabouts of his children has made a sincere effort to atone for his unworthiness and become reacquainted with his children in the hope that they might learn to love and respect him againan effort which Mrs. Hughes resisted.
While in Houston Mr. Skeen sought the help of the sheriff's office in an attempt to locate the children, but to no avail. The Harris County Probation Office had no forwarding address and Mrs. Hughes' relatives gave no information except that they had moved to Louisiana. Thereafter in 1954 Mr. Skeen went to Opelousas and sought the help of the sheriff who located Mrs. Hughes and the children in Lafayette. Mr. Skeen called at their home; and according to the testimony of himself and Mrs. Hughes, an argument ensued over the payment of support and Mrs. Hughes closed the door on him. He left without seeing the children. Mrs. Hughes testified that he came to the home "drinking heavily" and caused a scene. When he returned to the Lafayette address they had moved leaving no forwarding address.
Thereafter Mrs. Hughes and the children were located in Bunkie and Mr. Skeen saw *161 his daughter Janet on the street momentarily. Following this incident he suffered a serious leg injury and was hospitalized a month, and after recovery went back to Bunkie and found the Hughes family gone. He heard no more from them until this proceeding was filed and he was notified by the attorney appointed by the court to represent him.
It is admitted by stipulation of counsel that Mr. Skeen also attempted to locate the children by a check of the schools through Sheriff Hebert of St. John the Baptist Parish, in 1962 and 1963, on the belief that they were in that vicinity.
Mrs. Hughes denied that their frequent moves were to avoid contact with Mr. Skeen, but were because of her husband's employment with an oil company. She does admit, however, that she did not want the children to have contact with him because he had not paid the support due and she felt that he had forfeited his right of visitation. She admits that she did not notify the Harris County Probation Office of her removal from Texas or her new address. She did say that about once a year when visiting in Houston, she would call the Probation Department to see if any payments had been made. She was not asked for a forwarding address and gave none.
The child Janet testified that she wanted to be adopted by Mr. Hughes for he was the only father she knew. She did express a willingness to visit her real father and to become acquainted with him, but her stepfather objected to her doing so and that she respected his wishes.
After this proceeding was filed and while pending hearing, the child Kenneth went voluntarily to live with his father, and the petition was withdrawn as to him.
Mr. Skeen requested a delay of a few months in this proceeding to allow his daughter time to come to know him as he really is and not as her mother has pictured him to her, in the hope that she can then decide more maturely if she wants to be adopted. In view of the child's age and maturity, we do not think this was an unreasonable request.
Mr. Skeen and his present wife have adopted three children and apparently have attained a degree of independence and security.
Under the facts of this case, which we have related in detail and proper sequence from a careful reading of the transcript of testimony, our conclusion that the adoption should not have been granted, we thought, was amply supported by the decision of the Supreme Court in In re Ackenhausen, 244 La. 730, 154 So.2d 380 (1963), and the Second Circuit Court of Appeal in In re LaFitte, 168 So.2d 837 (1964). But we find now that the Supreme Court, having granted writs in the LaFitte case, in an opinion handed down May 3, 1965, reversed the Second Circuit Court of Appeal and reinstated the judgment of adoption. See In re LaFitte, Applying for Adoption, No. 47,571 on the docket of the Supreme Court, 174 So.2d 804 (1965). In view of that decision we have reexamined our position in the instant case and are still of the opinion, under the facts here presented, that the judgment of the Juvenile Court for Jefferson Parish is in error and should be reversed. We think the factual situation here is significantly stronger in support of the opposition to adoption than in the LaFitte case, and for this reason the LaFitte case does not control the conclusion here.
There is no inherent right of adoption. It is a creature of the law and exists only where the law expressly grants it and then subject to the restrictions and limitations which the law imposes. It may be considered a privilege or right bestowed by authority of the state. For example, there was no general law of the State of Louisiana authorizing adoptions prior to 1865. Article 35 of the Civil Code of 1808 stated: "Adoption which was authorized by the laws heretofore in force, shall be and is hereby abolished." This article was repeated (Art. 232) in the Civil Code of *162 1825. Therefore, all adoptions in Louisiana prior to Act 48 of 1865 were by special dispensation of the State by act of the legislature, an example of which is Act 65 of 1837.
Beginning with Act 48 of 1865 there have been several acts of the legislature providing general authority for adoptionall, however, subject to certain formalities, restrictions, and limitations having to do with forced heirship, illegitimate children, age of parties, race, etc.[1] In addition to these conditions most of the acts have contained requirement of consent of the child's living parents. In certain cases of surrender or abandonment the consent may be given by an agency or institution. Act 44 of 1934 amended Act 46 of 1932 to allow the parent to whom custody had been granted in divorce cases to give consent without the concurrence of the other parent. This provision carried over into Act 233 of 1936. This legislative waiver of consent of the parent against whom a custody judgment had been granted in a divorce decree obviously could lead to serious abuse. It did not even contemplate that such party be the guilty spouse, and it is generally known that in many cases custody of small children is given to the mother even though the father may be equally as worthy and morally suited. Evidently the legislature saw this danger, for in 1938 it passed Act 428 which provided that where the child has not been legally surrendered or removed from the custody of its parents by a court of competent jurisdiction "* * * a copy of the petition shall be served on each of the living parents * *. If the addresses of either or both parents are unknown, the State Department of Public Welfare shall make efforts to locate the parents if possible and obtain the necessary consent to the proposed adoption. * * *" (Emphasis added.)
Experience proved that some parents when located would neither consent nor oppose the adoption, since consent was "necessary" adoption could not be completed even though the parent was utterly indifferent and unworthy. So in 1942 the legislature enacted a new adoption law, Act 154. It provided for service as in civil proceedings on the parents of the child unless the child had been surrendered by them for adoption or adjudged abandoned, and in cases of absence or whereabouts unknown, the appointment of a curator ad hoc was authorized on whom service could be made. Further the State Department of Public Welfare was required to locate them, if possible, to inform them of the proceedings and "to determine their attitude toward the proposed adoption". This modification of language was to correct the weakness of the prior act, which apparently made consent "necessary" in all cases, and to vest in the court discretionary authority to act when a parent showed no interest and neither opposed nor consented.
It was under this statute that Green v. Paul, 212 La. 337, 31 So.2d 819 (1947), was decided by the Supreme Court. The Court there, after discussing State ex rel. Simpson v. Salter, 211 La. 918, 31 So.2d 163 (1947), which had held consent of the parent must continue to the final decree of adoption, reaffirmed its position that there can be no adoption without this continuing consent. The Court said in the Green case at p. 821 of 31 So.2d:
"* * * It has been firmly settled by this court that adoption is a creature of statute; that, this being so, it is only what the law makes it and that, to establish the relation, the statutory requirements must be strictly carried out, otherwise, the adoption is an absolute nullity. See Succession of Pizzati, *163 141 La. 645, 75 So. 498; In re Brands' Estate, 153 La. 195, 95 So. 603; Succession of Brand et ux., 162 La. 880, 111 So. 267; State ex rel. Monroe et ux. v. Ford, 164 La. 149, 113 So. 798; Hardy v. Mobley, 183 La. 668, 164 So. 621 and Owles v. Jackson, 199 La. 940, 7 So.2d 192.
"* * * In Louisiana, the jurisprudence is settled that consent of the natural parents is necessary (see authorities supra) as it has either been specifically required or contemplated by our statutes. Acts Nos. 31 of 1872; 173 of 1910; 48 of 1924; 46 of 1932; 44 of 1934; 233 of 1936; 428 of 1938 and 154 of 1942."
The necessity for continuing consent was reaffirmed in In re Byrd, 226 La. 194, 75 So.2d 331 (1954), and Madere v. Long, 231 La. 498, 91 So.2d 771, after the passage of Act 228 of 1948 (LSA-R.S. 9:421-9:441).
This act, 228 of 1948 (LSA-R.S. 9:421-9:441), as amended, is the present adoption law. It has substantially the same provisions as the prior act on service and notification of parents unless they have legally surrendered the child for adoption or it has been declared legally abandoned. Like the prior act, the "attitude" of the parent toward the proposed adoption shall be determined if possible. Thus, it would seem that it was intended that the court have some discretion when there is no opposition, but want of express consent. But where there is opposition as in the Byrd case and Madere v. Long, supra, there can be no adoption. The requirement for continuing consent as held in Green v. Paul, supra, and In re Byrd, supra, was modified by Act 268 of 1960 (LSA-R.S. 9:429) to provide that consent once given cannot be withdrawn after entry of interlocutory decree, except for cause.
Act 501 of 1958 (LSA-R.S. 9:422.1) allows the adoption to be granted without the consent of a parent when adoption is sought by a step-parent whose spouse has been awarded custody of the child and the other parent has refused or failed to comply with a court order of support for a period of three years or more. This was amended by Act 268 of 1960 to extend this right to a grandparent and reduced the time of default in support payments to one year. It is under the authority of this section (LSA-R.S. 9:422.1) that the right to adopt in the instant case without the consent and over the opposition of the child's father is claimed. The court below applied the provisions hereof strictly and granted the adoption.
The Supreme Court discussed the application of LSA-R.S. 9:422.1 in In re Ackenhausen, supra, and most recently in the LaFitte case. We thoroughly agree with the Court's statement in the Ackenhausen case, repeated in LaFitte:
"The basis for requiring the consent of parents to adoption is the natural right of the parent to his child. If a parent does not fulfill his parental responsibilities to his child, there is a reasonable basis for dispensing with his consent. We think the Legislature here was attempting to define conduct which would be a failure of the parent to fulfill his responsibility of support of his child, whereby the parent would forfeit his parental rights."
We agree that parents who have demonstrated over a long period of time an attitude of indifference and total disregard of their responsibilities to their children should forfeit their parental rights. The foregoing review of the statutes and jurisprudence of the State points up the reluctance of the legislature and the courts to leave the final dissolution of this sacred relationship in the discretionary authority of the court on the basis of worthiness. It emphasizes the concept of necessity of parental consent and the State's insistance that any act permitting forfeiture of this parental right by judicial decree be narrowly construed. In extreme cases of unworthiness *164 the decision might safely rest with the courts; but in borderline cases, where it is difficult for the court to determine the relative faults and worthiness of the parents, injustice could result. A just decision in such cases is made more difficult by the extreme emotional involvement which dictates the behavior of estranged parents. The courts cannot wholly escape the impact of this emotional pressure. So the legislature has attempted by LSA-R.S. 9:422.1 to lay down a test of parental worthiness, but a literal application of the test of payment or nonpayment as ordered could lead to harsh consequences. We do not think this is the intent of the law, when viewed in the light of the historical concept discussed above. We agree with the Supreme Court that it must be applied with caution and much consideration should be given to the cause of the failure to pay support as ordered. If the act is intended to be a test of parental worthiness, it would seem just and reasonable that consideration be given to the obstacles which a vindictive parent with custody has placed between the other parent and the child which render a demonstration of responsibility and worthiness extremely difficult, if not, as in this case, practically impossible.
It is true, as the trial judge observed, that if Mr. Skeen did not know where his children were, he did know where to find the Probation Department of Harris County, to whom he was ordered to make payments of support; but we do not think his failure to do so, under the circumstances of this case, is a fair test of his responsibility and worthiness as a parent. We conclude, therefore, that his failure to pay as ordered was not without just cause.
It should be pointed out further that the adoption law provides in LSA-R.S. 9:432, Subs. B:
"The court, after hearing and after taking into consideration information from all sources concerning the adoption, may enter a final decree of adoption; or it may deny the adoption. * * *" (Emphasis added.)
The use of the word "may" clearly reaffirms the historical concept that there is no inherent right to adopt, and the court, being the organ of the State, may or may not grant the adoption as the best interests of the child indicates.
In the instant case, we are not convinced that it would serve the best interests of Janet Marie that she be adopted at this time. From the confidential report of the Welfare Department, which is in the record, it is revealed that the Skeen children were allowed by their mother, until twelve years of age, to believe Mr. Hughes was their real father. This lends support to the conclusion we have reached that she concealed them from him and did everything she could to avoid contact. It must have been a severe emotional shock to them to learn their true identity. Children have rights too, and one of them is the right to know and love their parents. It should not be denied them except when the parent has proven himself unworthy of their love. Failure to make support payments in the face of the obstacles here presented is not, of itself, sufficient proof of that unworthiness.
Janet Marie will be seventeen years old on September 1, 1965, and should be mature enough emotionally to make this important decision for herself after she has had reasonable time and opportunity to become reacquainted with her father. This is not a case of an infant whose childhood lies before him, whose decision must be made by parents. The childhood of Janet Marie lies behind and she now stands on the threshold of mature womanhood. It is highly improbable that any disadvantage to her will result from a reasonable delay. She will continue to live with her mother and step-father and receive all the advantages they have to offer. In a relatively short time she will be old enough to execute on her own behalf, without the *165 consent of her parents, an act of adoption under LSA-R.S. 9:461. Furthermore, as indicated above, we are not so sure that Mr. Hughes now wants the adoption to be consummated. The best interest of the child would be served by resolving all these doubts against adoption at this time.
For these reasons, the judgment of the Juvenile Court for Jefferson Parish decreeing a final judgment of adoption in favor of J. A. Hughes of the minor Janet Marie Skeen and changing her name to Janet Marie Hughes is annulled and set aside without prejudice at appellee's cost.
Judgment annulled and set aside.
NOTES
[1] See Acts 48 of 1865, 17 of 1867, and 64 of 1868 incorporated in Revised Statutes of 1870, Sections 2322-2328. Civil Code of 1870, Article 214; Acts 31 of 1872; 48 of 1924; 46 of 1932; 44 of 1934; 233 of 1936; 428 of 1938; 154 of 1942; 228 of 1948 (LSA-R.S. 9:421-9:441). (Acts relating to adoptions of persons over 17 years of age and acts relating to foundlings, surrender and abandonment are not included.)