424 So.2d 383 (1982)
In re GLASS APPLYING FOR ADOPTION.
No. 15080-CAJ.
Court of Appeal of Louisiana, Second Circuit.
November 29, 1982.
Wilson & Veatch by Thomas A. Wilson, Jr., Shreveport, for appellant.
Weinstein, Moak & Hiller by Nelson A. Moak, Benton, for appellee.
Before PRICE, JASPER E. JONES and SEXTON, JJ.
SEXTON, Judge.
The instant appeal is brought by appellant CDS to challenge the adoption decree which severed his legal ties to his two natural children. The names of the parties involved *384 have been omitted in the title and in this opinion in accordance with LSA-R.S. 9:437. The decree conferred CDS's parental rights with respect to the two children upon the children's stepfather, SDG, who is now married to the children's natural mother. The trial court found, in granting the adoption decree, that CDS had forfeited his legal right to oppose the adoption of his natural children, and that the adoption was in the children's best interest. We reverse.
Although the record is unclear as to the date, it appears CDS married KS(G) in the late nineteen-sixties or early seventies. The couple's matrimonial domicile was Houston, Texas. The marriage produced a son and a daughter, Se and Si, now aged eleven and eight years, who are the subject of these proceedings. This marriage ended in divorce on December 5, 1978, with KS(G) receiving custody of the two children.
On December 29, 1978, KS(G) [hereinafter referred to by her current initials KG] married her current husband, SDG. Since that time, she has resided with her children in SDG's Shreveport home. SDG, as the stepfather of KG's two children and the husband of their natural mother, has petitioned the juvenile court to adopt the children and be declared their father for all legal purposes. His wife, KG, the children's mother, has formally consented to his petition for adoption.
The children's father CDS married his present wife, PS, on October 17, 1979. Since that time they have lived in the Houston home he formerly shared with his exwife KG.
The record unequivocally indicates that petitioner SDG and his wife KG have labored diligentlyand with admirable resultsto provide a good home for the children. It is particularly noteworthy that SDG has two sons and two daughters from a former marriage, as well as a two year old son who is the issue of his current marriage to KG. Despite providing a home forand guidance tothe children from three different marriages, SDG has treated all the children equally and impartially. He has designated Monday night as a family night, in which family members are expected to be present, and alleven the youngest of the childrenare allowed to voice their opinions and complaints.
SDG has painstakingly taught the children lessons of self discipline, hard work, and responsibility, and has inculcated them with religious instruction. He assists Se in learning the skills required for cub scouts and provides supervision and transportation in the summer when Se mows lawns to earn spending money and learn the lessons of thrift and labor. SDG has set up guidelines whereby the children put a specific portion of their earnings into savings and contribute another portion to the church. In accordance with their parents' Mormon faith, the children do not use caffeinated drinks. SDG disciplines the children with patience and reason, and as family friend, MW relates:
"[SDG] is a very thorough and he is very fair and when he tells [Se] to do something or [Si] to do something, he gives them a reason why. He explains why he should be doing it and how to do it and if they disagree with him, he talks to them until they understand."
As the foregoing demonstrates, the petitioner SDG and his wife have a very profound love and concern for the two children. However, the evidence demonstrates with equal clarity, a close and loving relationship between CDS and his natural children.
The children are generally guests at the Houston home of CDS and his current wife PS four times a yearat Christmas, Thanksgiving and Easter holidays, and during the summer. The duration of these stays ordinarily ranges between three and seven days, with the average stay lasting approximately five or six days. The CDSs plan a number of activities with the children well in advance of the children's arrival. Christmas and Thanksgiving holidays generally include holiday dinners at the home of the children's grandmother in which the children's uncles, aunts and cousins on their father's side are included. According to PS, she and her husband "always *385 wait to have Christmas until we pick up the children," and plan such that their vacation time corresponds with the children's Christmas visitations. In summary, the children's visits to Houston are characterized by the CDSs attempts "to do as much as we can cram into one week ...."
When the children are at their home in Shreveport, CDS and PS periodically converse with them over the telephone. They buy both Christmas and birthday gifts for the children, including bicycles, phonographs and clothing, and provide them with spending money for their visits to Houston.
CDS's past behavior has not been flawless. The record indicates he has had some difficulties with alcoholic beverages. However, the testimony unequivocally indicates that he is a diligent worker, his reputation in the community being that "he is a very upstanding, respectful, hard working man." In order to avoid endangering his visitation privileges with the children, CDS has totally abstained from alcohol since Labor Day of 1980 and takes his children to church on the Sundays that they visit. The trial assessment of clinical psychologist Donald Gucker was that CDS did not manifest any emotional pathology upon evaluation and "looked very acceptable."
The uncontroverted testimony adduced at trial was that CDS and PS enjoy a stable and loving marital relationship, unmarred by physical separations. As five witnesses fully attested, PS herself enjoys a very loving relationship with the children. According to family friend JB:
"[H]is present wife, [PS], she is a very loving person and uh, [the children], they will come down, you know, and I know that she loves on them quite a bit and [Si] will crawl up in her lap and tell her or call her mother or mommie and tell her how much she loves her and [PS], she returns the love and, you know, it is always a constant, you know, an arm around one of the children, you know, or I sure do love you or something of this effect and she also does her own children the same way, plus my children."
PS has two children from a former marriage, furthermore, and it appears from the record that they treat Se and Siaffectionatelyas their brother and sister.
In the Texas divorce decree of December 5, 1978, which dissolved the marriage of CDS and KG, CDS was ordered by the court to make total child support payments of $200 per month. CDS did not make any support payments from January 1, 1979 until January 1, 1980. After a year of nonpayment, CDS made four payments for January, February, March and April of 1980. Following these four successive payments, there was a fifteen month lapse from May of 1980 until August 1, 1981 in which no payments were made. Payments were then made for August, September, October, November and December of 1981; a payment was made also in January of 1982, shortly before the trial from which this appeal was perfected. Additionally, the CDSs in June of 1981 sent a cashier's check for $1,000payable to KGto the Department of Health and Human Resources caseworker assigned to this adoption case. At the rate of $200 per month, a total support obligation of $7,200 had accrued in the 36 months spanning the original due date in January of 1979 and the time of trial in January of 1982. CDS has discharged $3,000 of this obligation, leaving an unpaid arrearage, as of the trial date, of $4,200.
CDS attempted to establish, at trial, that his failure to make support payments was justified. CDS was a self-employed building contractor. His business virtually stopped and he suffered substantial losses when construction slowed in the Houston area prior to his divorce. At the urging of a friend, he started his own backhoe business as an independent contractor. This business venture, after a significant investment, also failed. He subsequently made an unsuccessful attempt to return to the contracting business, then worked for Design Fabricators at an hourly wage for eight and a half months. CDS ultimately returned to the contracting business. Although his employees were paid weekly he himself often went without pay for up to a *386 month. There were intervals, during this succession of jobs, when he was without work for several weeks.
LSA-R.S. 9:432(B) provides the ultimate criteria for determining whether, in a given instance, an adoption should be granted. This statute provides, in pertinent part, that:
"The court, after hearing and after taking into consideration information from all sources concerning the adoption, may enter a final decree of adoption; or it may deny the adoption. The basic consideration for this decree ... shall be the best interest of the child." (emphasis added).
It is a well settled jurisprudential rule, moreover, that an adoption may not be granted absent the consent of both natural parents. In re Plaisance, 394 So.2d 776 (La.App. 4th Cir.1981); In re Genin, 240 So.2d 46 (La.App. 4th Cir.1970). The exceptions to this fundamental rule are provided by LSA-R.S. 9:422.1. This statute stipulates that the consent of the non-custodial parent is not essential where the petitioner is a step-parent married to the custodial spouse, and one of the following conditions is met:
"(1) The other legitimate parent has refused or failed to comply with a court order of support for a period of one year.
(2) The other legitimate parent is a non-resident of this state and has failed to support the child for a period of one year after judgment awarding custody to the mother or father or grandparent or grandparents.
(3) The other legitimate parent has refused or failed to visit, communicate, or attempt to communicate with the child, without just cause, for a period of two years." LSA-R.S. 9:422.1(1)(3).
The legal consequences of an adoption are abrupt, severe and irrevocable: the relationship between the child, and the non-custodial natural parent is severed. LSA-C.C. Art. 214 provides, with respect to that relationship, that:
"the blood parent ... [is] relieved of all of [his] legal duties and divested of all of [his] legal rights with regard to the adopted person, including the right of inheritance ...; and the adopted person... [is] relieved of all of [his] legal duties and divested of all of [his] legal rights with regard to the blood parent ...." (emphasis added).
The analytic framework for determining whether an adoption may be granted derives from the interaction of Sections 9:432 and 9:422.1. This statutory interaction has been treated by the Supreme Court in Adoption of Latiolais, 384 So.2d 377 (La. 1980), and considered by this court in In re Hinton, 390 So.2d 972 (La.App. 2d Cir.1980). The basic observation of these two landmark decisions is that a court may not properly grant an adoption merely because one of the conditions of LSA-R.S. 9:422.1 has been met, and the necessity of the natural parent's consent has thus been statutorily dispensed with. The court must still satisfy itself that the adoption is in the best interests of the child. A court may find that a parent has lost his or her natural right to oppose an adoption without finding that an adoption is in the best interests of the child.
It is of course clear, in the first instance, that an adoption may be defeated by the opposition of a natural parent alone unless one of the three enumerated conditions of LSA-R.S. 9:422.1 has been met. We find, however, that in the instant case a condition of LSA-R.S. 9:422.1 has transpired, and that the consent of the natural father, CDS, is therefore not essential to this adoption.
It is apparent that under the literal terms of LSA-R.S. 9:422.1 CDS has lost his right to unilaterally oppose the adoption of his natural children. Under our facts: the petitioner (SDG) is the spouse of the children's legitimate parent (KG); the petitioner's spouse, KG, has been granted custody of the children; and the other legitimate parent, CDS, "has refused or failed to comply with a court order of support for a period of one year," insofar as he violated a court order by failing to make support payments for a *387 fifteen month period from May of 1980 to August 1, 1981.
It is too well settled to require citation that just cause or circumstances beyond one's control excuse non-support and prevent parental consent from being dispensed with as a pre-requisite to adoption.[1] Nevertheless, once non-payment is shown, the natural parent has the burden of proving that this failure is with just cause or has been occasioned by circumstances beyond his control. In re Plaisance, supra; Berry v. Berryhill, 330 So.2d 405 (La.App. 3d Cir.1976). CDS has not proven, with the requisite thoroughness and specificity, that his failure to make support payments was based on just cause, or factors beyond his control. CDS did not establish, with respect to the time period involved, what his total income was, what his assets were, whether any sources of outside income were available to him, whether and at what wage his present wife was employed. He did not establish precisely how long he was unemployed, how much loss resulted from his business failures, the amount of legal expense incurred in the suit pending against him, or the amount of the medical expenses incurred in treating his wife. The amount of his present wife's assets, and the quantity of assets which his former wife has donated to him is left unclear, as is the size of the community debt from his former marriage, and the question of who, if anyone, has been discharging this debt. In short, fundamental questions remain unanswered. We do not find that CDS's failure was without just causeindeed the record supports the inference that CDS encountered genuine financial difficulties. We do find, however, that because of the incompleteness of the evidence adduced, CDS has not sufficiently discharged his burden of proving just cause.
While finding that CDS has not proven that his failure to make support payments was justified, and that he has therefore lost his right to unilaterally block the adoption, we nevertheless vacate the adoption decree rendered by the trial court on the grounds that this adoption is not in the best interests of the children.
The Louisiana courts have historically articulated a pronounced reluctance to sever the parent-child relationship and derogate from the natural rights inherent therein.[2] A parent's failure to make support payments, has never meantin and of itselfthat it is in the best interests of the child for his or her filial ties with the natural parent to be severed. Thus the courts have often found that, even where a natural parent has failed to make support payments, it is not in the best interests of the child to sever his or her relationship with that natural parent. In re Hinton, supra; Adoption of Latiolais, supra. See also, Adoption of Edwards, 369 So.2d 210 (La. App. 3d Cir.1979). As was stated in In re Hughes, 176 So.2d 158 (La.App. 4th Cir. 1965), children have a "right to know and love their parents. It should not be denied them except when the parent has proven himself unworthy of their love. Failure to make support payments ... is not, of itself, sufficient proof of that unworthiness." Id. at 164.
*388 The more subtle point implicit in both Latiolais and In re Hinton is that a dual focus is appropriate in determining the best interests of the child. It is not enough to examine the love and home environment provided by the petitioner/step-parent. It is necessary as well to examine the depth and closeness of the child's ties with the non-custodial natural parent, and the effect which the loss of this relationship would have on the child. A "best interest" evaluation is by its very nature a factual or ad hoc analysis. Thus each case must turn on the particular circumstances underlying the child's relationship with both the petitioner/step-parent and the non-custodial natural parent. However, we note with particularity the cases in which an adoption has been denied even though it appears from the facts that the petitioner/step-parent provides a good home for the child. Latiolais, supra; In re Hinton, supra, Steed v. McKenzie, 344 So.2d 689 (La.App. 1st Cir. 1977).
It was the uncontradicted testimony of five witnesses that CDS has a very close and loving relationship with his children; JB testified that CDS spoke of his children virtually everytime she saw him. Furthermore, several witnesses testified that the children deeply love their father. At trial even SDG and KG did not dispute the bond of love between CDS and his two children. The trial testimony, moreover, was unequivocally to the effect that there is a reciprocal love between CDS's present wife, and the two children. It is also clear that PS's own son is very close to the children.
The testimony of clinical psychologist Donald Gucker, who evaluated Se and Si on two occasions, is particularly instructive. Gucker testified that Se, as "the spokesman for the two," indicated that:
"he wished to remain a S and he wished not to be adopted and that he felt very close to his natural father.... It was clear to me, from these reactions, that the children have a significant emotional investment in the relationship with their natural father and I felt like, you know, these two kids were not saying simply words, but there was a lot of feeling going on with the words, and they didn't want to lose that relationship and I felt that that was important for them"
Furthermore, Gucker testified, Se
"talked to me about that he would really prefer to live with his natural father....... and basically the message was, you know, wewe want to still be close to our dad. So, somehow they interpreted adoption as either diminishing or decreasing or terminating that relationship."
Mr. Gucker concluded that CDS "obviously... enjoys a relationship with [the children]. There is no question in my mind about that, none."
Our assessment of the testimony in guided by the principles enunciated in In re Hinton:
"The seriousness and finality of the severing of the relationship between the parent and child is a factor to be considered. The importance and benefit to the child of a continued relationship with a parent is to be considered.
"The fact that the father has forfeited his parental right to insist on continuation of his legal relationship with his children does not mean that the children should necessarily have their right to a relationship with the father legally terminated. Where the evidence indicates a real probability that the children can have and enjoy and benefit from a continuing relationship with their father, this is an appropriate factor to be considered in determining the best interest of the children." Id. at 976.
We do not condone non-support, and find that under our facts CDS has lost his unilateral right to oppose and thwart the adoption of his children Se and Si. We nevertheless hold that even though this petitioner/step-parent provides a loving home for Se and Si, it is not in the best interest of the children to deprive them of their close relationship with their natural father.
The trial court is thus reversed, and the decree of adoption vacated at appellee's costs.
REVERSED AND VACATED.
NOTES
[1] In re Plaisance, supra; In re Ragas, 393 So.2d 925 (La.App. 4th Cir.1981); Adoption of Jarreau, 373 So.2d 1352 (La.App. 1st Cir.1979); Adoption of Rapp, 348 So.2d 107 (La.App. 4th Cir.1977); Adoption of Fouts, 254 So.2d 649 (La.App. 4th Cir.1971); In re Spraggins, 234 So.2d 462 (La.App. 1st Cir.1970); Adoption of Schieman, 204 So.2d 433 (La.App. 4th Cir. 1967); In re Hughes, 176 So.2d 158 (La.App. 4th Cir. 1965).
[2] In re Plaisance, supra; In re Ragas, 393 So.2d 925 (La.App. 4th Cir.1981); In re Whitten, 391 So.2d 44 (La.App. 3d Cir.1980); In re Hinton, supra; Adoption of Latiolais, supra; Haynes v. Magnham, 375 So.2d 103 (La.1979); Adoption of Jarreau, 373 So.2d 1352 (La.App. 1st Cir. 1979); Adoption of Rapp, 348 So.2d 107, (La. App. 4th Cir. 1977); Steed v. McKenzie, 344 So.2d 689 (La.App. 1st Cir.1977); Adoption of Fouts, 254 So.2d 649 (La.App. 4th Cir.1971); In re Genin, supra; In re Spraggins, 234 So.2d 462 (La.App. 1st Cir.1970); Roy v. Speer, 249 La. 1034, 192 So.2d 554 (1966); Adoption of Bickerstaff, 190 So.2d 117 (La.App. 4th Cir.1966); In re Hughes, 176 So.2d 158 (La.App. 4th Cir. 1965); In re Ackenhausen, 244 La. 730, 154 So.2d 380 (1963).