SEXTON, Judge.
The natural father appeals the ruling of the trial court which granted the adoption of his minor child to the child’s step-father. We reverse.
FACTS
Mi was born of the marriage between KS and AG who had been judicially separated three weeks prior to the birth. The parties were divorced on July 13, 1983. KS, the mother, was granted custody of Mi and awarded child support in the amount of $400.00 per month with reasonable visitation privileges granted to AG, the father. KS thereafter moved into the home of PS in February of 1985 and the two married on April 12, 1985. Mi has resided with his mother since birth.
On July 31, 1986, PS filed a petition to adopt the minor child. In his petition, he alleged that AG’s consent was not required because of his failure to comply with the order of support for the child for a period of more than one year. AG denied the allegations and the matter was set for trial. The trial court granted the adoption, finding that the consent of AG was not required as “the custody dispute [was] not just cause for failure to make a significant contribution under the support judgment.” It therefore determined that the contributions made between February of 1985 and July of 1986 were not significant contributions sufficient to comply with jurisprudential rules.
Secondly, the trial court found that the adoption was in the child’s best interest as the relationship between PS and KS was a stable one, which in turn fostered a stable environment for the child. The court noted also that the contact between AG and Mi, although initially sporadic, had deteriorated to the point of little or no contact.
AG appeals the judgment of adoption, claiming that he has substantially complied with his support obligation. He further argues that the best interest of Mi are not served by the adoption, as he has maintained continuing contact with the child, although limited by KS, and took legal action to enforce his visitation rights. He also contends that he attempted to make an offer for the settlement of his child support obligation but was refused by KS and PS. He claims that the child will be harmed by not having the opportunity to know his natural father and receive his natural father’s love and affection. Thus, appellant argues that the trial court erred in determining that AG’s consent was unnecessary for the adoption and in determining that the best interest of the child was served by the adoption.
The trial testimony revealed that Mi was born less than a month after AG left the matrimonial domicile in September of 1983. In January of the following year, AG moved to Dallas, Texas. Child support payments of $400.00 per month were set by the court, but an informal agreement was reached whereby AG would pay KS’s townhouse note instead. KS testified that the informal agreement ceased to be effective in January of 1985 when she moved out of the townhouse. After this time AG did not make support payments.
She claimed that the contact between her, the child and her ex-husband was rare in the period between the child’s birth and the divorce. KS testified on cross-examination that she did not permit AG to take the child for overnight visits. She noted that soon after the divorce when AG came to town he would visit the child. In 1984, she took the child to Dallas on several occasions to spend the weekend and on one occasion AG kept the child for a week. In 1983 and in 1984 the child visited AG’s mother’s house in Bossier City and AG spent time with the child on Christmas of both years and Thanksgiving of 1984.
She testified that during the beginning months of 1985 AG did visit the child at her places of employment. The step-father would bring the child to her place of employment and the father and child would visit. However, she noted that after she moved in with the step-father, she did not give the father the information concerning her address. After this time, in 1985, she testified that she allowed the child to visit with the father out of her presence, but only for a few hours in the afternoon. She *1054 further stated that there were occasions when AG did not call a week in advance and she denied him the right- to visit the child. An agreement was made, she claimed, that would allow the father to visit the child during the third week of the month but only upon a week’s notice. She said, however, that any attempt to encourage the relationship between the child and the father ended in September of 1985 when negotiations between the two ceased to be cordial as AG refused to accept the proposed name change of the child.
The parties attempted to enter into an agreement that the child’s name would be changed to the step-parent’s name. She testified that as part of this agreement, the father agreed to tender a $1000.00 payment plus $250.00 per month thereafter in exchange for a visitation agreement whereby the father would see the child the third week of the month with a provision for a week’s notice to be given by AG prior to visiting. However, AG changed his mind about the name change. After this point, AG commenced paying some child support which she refused to accept. The discussions thereafter resulted in an agreement whereby AG would put money in a savings account for the child. KS testified that in August, September, and October of 1985, AG tendered $250.00 each month but that she refused to accept the payments. She did reveal that during 1985 she was aware that her attorney was involved in negotiations with AG’s attorney concerning arrear-ages and child support as well as child visitation.
In 1986, the father visited the child on Thanksgiving as well as Christmas. The visits generally lasted for 45 minutes but KS revealed that on the Christmas of 1986 visit, she and the step-father waited outside in the driveway during the visit which lasted for an hour and a half. She testified that AG purchased Christmas gifts for the child in Christmas of 1986. Finally, KS testified that in March of 1986 AG’s attorney offered $1,000.00 and twelve $300.00 post-dated checks in order to settle the child support. However, she refused the offer and no counter offer was made. Additionally, there was a check tendered for child support in November, 1986 which was returned for insufficient funds after being cashed in 1987.
The mother testified that she has “gone out of [her] way to establish a relationship” and that she had taken the child to Dallas to visit his father on several occasions. KS testified that the relationship between Mi and the father is more in the nature of an uncle-nephew relationship and that the “child can take them [the visits] or leave them.” The mother further noted that AG does not inquire about the child’s well-being and does not call him, and further did not recall his fourth birthday. On the other hand, she noted that the child looks to his step-father as his father and the relationship is a very close one.
The evidence presented on behalf of the defendant consisted of the testimony of Mr. Tommy Johnson, an attorney for AG. Mr. Johnson testified that he represented AG in his divorce and was contacted again in November of 1985 relevant to child custody and visitation. At this point, Mr. Johnson testified, his client informed him that KS would not tell him where she lived or where the boy’s day care center was. He therefore had very little opportunity to see the child and requested that Mr. Johnson file a rule for custody. The trial court took judicial notice of the rule for custody which was in fact filed. Mr. Johnson testified that he informed AG of the consequences of his failure to provide child support for the child. Nevertheless, AG wanted to file the rule. Negotiations between the attorneys for the two parties continued until March 25, 1986 when Mr. Johnson and AG offered to pay an immediate $1,000.00 as well as $300.00 per month for child support for the remainder of year. However, Mr. Johnson testified this offer was never accepted. Thereafter, on July 31, 1986, the petition to adopt the child was filed. The rule for custody and visitation was therefore never heard but has not as of yet been dismissed.
PS, the step-father of the child, likewise testified. He testified that the parties moved in together on February 1, 1985, as the two planned to get married. He *1055 claimed that he and Mi have a very good relationship and he treats the child no differently than his other children. He also testified that in his opinion, AG wanted nothing to do with the child and had no knowledge of the child’s activities. He stated that AG has not remembered the child for any but his first birthday. He added that AG did call a few times after they got married, but has not been involved in any of the activities of the child. He admitted that on several occasions, AG called and PS refused to allow him to speak to Mi or KS. Collectively, both KS and PS have encouraged the child to assume that his last name is that of PS and the relationship between AG and the child has never been discussed.
Finally, the testimony of AG reveals that in 1984, consistent with KS’s assertion, the parties had a good relationship and KS allowed the child to visit him in Dallas. He testified that the relationship became strained when she moved in with PS. He testified that he did not have the address but did obtain the phone number from a long distance operator. In the first part of 1985 arrangements were made whereby he could see the child but only at KS’s places of employment. The parties then went to see a counselor to try to arrange some type of agreement relevant to child support and visitation. This was in mid-1985. They entered into a partial agreement whereby Mi’s name would be changed and AG would give KS $1,000.00 and pay $250.00 a month. However, AG testified that he changed his mind relevant to the name change as he felt that he would not be able to see the child as much. After this, he tendered three checks for $250.00 which KS would not accept. After the agreement to change the name was not honored by AG, KS requested that AG start a savings account for the child which AG attempted to do. In July of 1985 he evidently paid car notes on a car that he gave to KS, as he claimed to be attempting to help her financially. After this time, he requested visitation and it was then, he states, that KS refused to allow him to see the child on at least three or four occasions. At this point, he enlisted the services of an attorney to file the rule for visitation.
The next Christmas, in December of 1985, he saw the child for about six hours and brought Christmas presents for him. He testified that he ceased trying to contact KS directly. He also testified that he recently sent a check for $250.00 in November, 1986, which he requested KS to cash. However, she failed to do so until after Christmas of that year. AG testified that since he thought she was not going to cash the check, he spent the money. Therefore, the check bounced. He did inform the parties of what was going to happen and offered to make the check good, but the parties refused, according to his testimony. He saw the child for about an hour in November of 1986 when he found that KS and PS were going to be in Dallas. On Christmas of 1986 he was allowed to see and exchange gifts with the child for an hour and one-half at his mother’s house. He testified that, however, KS and PS sat in the driveway during that time and would not leave.
There was also testimony from independent witnesses. SB, a friend of the family, testified that she knew the parties and the child. She has been a neighbor of KS and PS for over four and one-half years. She has close contact with the family and testified that AG left town before the baby was born and she attended KS when Mi was born. She testified that PS is a very good father, supports the child, and has a very happy family relationship with KS and Mi.
The testimony of GK on behalf of the step-father revealed that he has a very good job and a very secure position with his company. GK knows the family and the child and feels that the relationship is a very good one.
Finally, there was testimony by SB, who is AG’s girlfriend. She also knows KS and knew the parties when they were married. She testified that she was present when the child was allowed to visit AG for a week at his apartment in Dallas. She testified that just after the divorce the relationship between AG and KS was a very close one but it began to deteriorate. This occurred af *1056 ter KS moved in with PS. She testified that after this point AG was allowed to see the child in Shreveport, but had to pick him up at KS’s place of business.
Although the issue of consent arguably presents a close question, we assume arguendo for the purposes of this opinion that the issue of consent was correctly decided as we determine that the best interest of the child is best served if the ties between the child and his natural parent are not severed. See Adoption of Latiolais, 384 So.2d 377 (La.1980); In re EWB, 441 So.2d 478 (La.App. 2d Cir.1983); In re Glass, 424 So.2d 383 (La.App. 2d Cir.1982); In re BAS, 424 So.2d 405 (La.App. 2d Cir.1982). Our decision in this regard therefore should not be construed as condoning the non-payment of child support as the actions of AG in this regard leave much to be desired. The support of a child is one of the strongest obligations the law imposes upon a parent. Denial of visitation privileges does not justify the failure to pay child support. In re EWB, supra.
The major standard to which a court must look in determining whether to grant an adoption is the best interest of the child. In re DWH, 457 So.2d 137 (La.App. 2d Cir.1984). A dual focus is appropriate in determining the best interests of the child. It is not enough to examine the love and home environment provided by the petitioner/step-parent. It is necessary as well to examine the depth and closeness of the child’s ties with the non-custodial parent, and the effect which the loss of the relationship would have on the child. In re Glass, supra. Because each adoption case presents a unique set of facts and because numerous factual considerations must be taken into account by a juvenile court judge when determining where a child’s best interests lie, the judge necessarily must be vested with great discretion. This court will ordinarily not try to second-guess a juvenile court judge who is in the better position to make a best interest determination. In re Hinton, 390 So.2d 972 (La.App. 2d Cir.1980), writ not considered, 396 So.2d 1350 (La.1981); In re DWH, supra.
On the other hand, Louisiana courts have historically articulated pronounced reluctance to sever the parent-child relationship and derogate from the natural rights inherent therein. See In re Glass, supra. While the natural parent's failure to pay child support and the relationship between the child and the step-parent are certainly factors to be considered in determining the child’s best interest, they are not the controlling factors. The controlling factor for determining the child’s best interest is the quality of the relationship between the child and the non-custodial parent who has not paid child support and whether it would be conducive to the child’s best interests to maintain that relationship. Regular visitation, or attempted regular visitation, tends to show the relationship is good. In re EWB, supra.
In the instant case, we cannot determine that the best interest of Mi is served by severing the ties between the child and his natural father.
The record clearly shows that AG has attempted to maintain a relationship with Mi. There was no argument on the part of KS that soon after the divorce, the relationship between the parties was a good one. Although this relationship deteriorated after January of 1985, this deterioration was partly due to extenuating circumstances brought on by the actions of KS. KS admitted that she did not provide AG with her new address and likewise admitted that he was prevented from speaking to the child and visiting with the child on occasions as she felt it was not in accord with their mutual agreement. Even when AG was allowed to visit he was frequently limited in the time and location by the presence of KS and PS. Even so, AG persisted with futile attempts at visitation and visited the child during the holiday season despite the distance between the parties. Although his visits did become sporadic, we cannot say that his actions were unreasonable in light of the circumstances.
KS also argues that the child views AG as “an uncle” as opposed to a father figure. However, there is testimony that this understanding on the part of the child was fostered by KS and PS. They have not *1057 informed the child as to who his father is nor do they intend to do so at this time.
AG indicates that he loves his son and has demonstrated this by filing proceedings in Louisiana to enforce his visitation rights and by making the necessary trips to Louisiana from Dallas in connection with the proceedings. Although he may have been lax in his child support obligations, he made attempts at rectifying the situation by making offers to KS and PS, who rejected the same. In re EWB, supra.
Therefore, after considering all the evidence presented at trial, we determine that the best interest of Mi is served by the reversal of the trial court judgment granting the adoption to PS. Clearly, the child is in a stable environment and AG testified that he would do nothing to interfere with the relationship between KS and PS and the child. The mother and step-father will provide the child with an excellent home. However, the child will be able to see his natural father and enjoy the benefits which flow from this relationship.
For the foregoing reasons, the judgment of the trial court granting the adoption and ordering the child’s name to be changed is reversed and the petition for adoption is denied. All costs herein are assessed against petitioner-appellee.
REVERSED.