594 So.2d 1383 (1992)
In re R.W.T. APPLYING FOR ADOPTION OF J.D.
No. 23604-JA.
Court of Appeal of Louisiana, Second Circuit.
February 26, 1992.
*1384 Nelson W. Cameron, for appellant.
Peatross, Greer and Frazier by John M. Frazier, for appellee.
Before NORRIS, BROWN and STEWART, JJ.
STEWART, Judge.
In this adoption case, the stepfather, RT, petitioned to adopt his wife's child, JD, (now JT). RT alleged that pursuant to LSA-R.S. 9:422.1, the consent of the natural father, ED, was waived because ED failed to pay child support for over a year. *1385 The child's mother, CT, formally consented to the adoption but ED opposed it. The trial court granted the adoption, holding that it was in JT's best interest. ED now appeals, advancing three assignments of error:
(1) the court erred by failing to find that LSA-R.S. 9:422.1 is unconstitutionally excessive punishment or is cruel and unusual punishment.
(2) the court erred by finding that granting of the adoption was in the best interest of the child.
(3) the court erred by admitting post-petition evidence.
For the reasons assigned, we affirm.

FACTS
CT and ED were married on October 25, 1974. On August 28, 1976, one child, JT, was born to this union. The marriage between CT and ED was a "stormy" one which eventually lead CT to seek a separation which was granted on February 16, 1979. CT was awarded the permanent care and custody of JT and ED was ordered to pay $125 per month in child support.
On the day the separation was granted, ED brutally attacked and beat CT which resulted in her having three ruptured spinal discs. As an encore to the beating, ED rammed his car into CT's car in an attempt to force her off the road. The minor child was riding in the car at the time.
On September 14, 1979, ED again attacked CT which resulted in contusions and abrasions to her forehead and a human bite to her right hand inflicted by ED. ED also constantly verbally harassed CT by calling her at home and at work. ED kept CT's apartment under "surveillance" from a nearby restaurant. ED threatened to remove JT from the country, but never carried out the threat.
On May 14, 1980, CT was awarded a judgment granting a divorce which included a visitation schedule providing that ED would have visitation with JT on the first and third weekends of every month, two weeks in each summer, and alternating Christmas and Thanksgiving holidays. Also, the court ordered ED's mother (LD) to pick up JT from his home in Shreveport when visitation was to be exercised and return him to CT's parents' in Arcadia because of ED's prior violent actions toward CT. ED made no efforts to exercise his visitation rights with any regularity. However, JT continued to visit with his paternal grandparents and his aunt and uncle in Arcadia.
On July 26, 1981, CT married RT, a physician in Shreveport. ED moved to Midland, Texas and his visits with JT became more infrequent. In the Summer of 1986, ED returned to Louisiana from Texas and enrolled in Louisiana Tech University. ED's visits remained infrequent and his child support was delivered by checks via ED's mother. In June 1986, CT received a check for $500 from ED for delinquent child support to cover the months of March, April, May and June 1986. Thereafter, ED failed to pay any child support until after the petition for adoption was filed.
Prior to the filing of the petition for adoption, CT contacted ED regarding the delinquent child support and requested that he bring it current. ED responded that his mother, LD, handled his child support and he would check with his mother and let CT know about the child support payments. ED never contacted CT. Also, during the conversation with ED, CT informed him of JT's behavioral problems and requested that he join them in discussion of the matter. ED responded that he was "very busy" and did not know when he could meet with them. ED made no attempts to visit or contact JT. JT had only three visits in 1986 with anyone in ED's family.
JT's behavioral problems continued throughout December 1986 and became increasingly worse in early 1987 requiring RT and CT to seek family counseling. CT again contacted ED regarding JT's behavioral problems, but ED advised her that he was busy and did not know when he could meet with them. CT made several other attempts to get ED to join them to discuss JT's behavioral problems but she was unsuccessful in getting his assistance in the matter. RT and CT proceeded with family *1386 counseling and JT's behavioral problems abated significantly.
From January to March 1987, ED made no attempts to contact JT nor were there any visits by ED's family. On April 10, 1987, ED contacted CT and asked if JT could accompany him to an air show. Because JT was grounded for disciplinary reasons, he was not allowed to go with ED. This call was the first contact between ED and JT since late 1986. Also, ED requested to exercise visitation rights with JT on the following weekend but because the following weekend was Easter and plans had already been made, JT did not wish to go visit with ED. JT was allowed to visit the next weekend with ED. The weekend was traumatic for JT who declared to RT and CT he would never go back to visit ED.
On August 18, 1987, RT filed a petition for adoption of JT. RT did so because he felt it would be in JT's best interest to formalize their relationship and stabilize JT's life. On August 30, 1987, ED was served with notice of the adoption petition and on September 1, 1987, ED called CT and threatened that he would kill RT.
On September 10, 1987, ED called again screaming profanity at CT. On September 18, 1987, CT received a call from her neighbor who related that ED had pulled into the neighbor's driveway and attempted to talk to JT as JT was getting off the school bus. JT had gone into the neighbor's house crying and upset because he did not want to go with ED. JT later told CT and RT that ED had threatened to beat them to a "pulp." On September 19, 1987, ED called again and threatened RT that he, ED, would be RT's "worst nightmare." On October 2, 1987, ED entered a school bus looking for JT, however, JT was not on the bus.
On November 13, 1987, ED sneaked through a wooded area near RT's and CT's home and forcibly abducted JT. CT was inside the house when a neighbor notified her that ED had abducted JT. CT ran into the house, grabbed a gun to protect herself, and went after ED. As ED emerged from the woods with JT, CT demanded the child's release. ED refused to release JT. ED placed JT between him and CT at which time, CT lowered the gun which she had raised. ED then lunged toward CT pushing her down and the gun fell to the ground. JT was able to escape and run across the street into a store to seek refuge from ED. ED picked up the gun and pointed it at JT as he ran across the street but he did not discharge the gun. ED then turned his anger and rage toward CT and began to beat her violently and unmercifully. ED kicked CT and attempted to run over her with his car but she was able to escape the wheels of ED's car. CT's injuries were massive; they included a fractured orbit and floor of her eye, two fractured molars, damage to her temporo-mandibular joint and severe scleral hemorrhage, facial contusions, and a bruised rib cage from the kicks inflicted by ED.
Following a trial on the adoption petition in 1988, the Juvenile Court held that: (1) ED's failure to pay child support was unjustified; (2) ED forfeited the right for his consent to be required to the adoption under LSA-R.S. 9:422.1 because of his failure to pay child support for over one year; and (3) it would be in the best interest of the child to order adoption.

DISCUSSION
The law applicable to stepparent adoption is stated in LSA-R.S. 9:422.1 in pertinent part:
§ 422.1. Adoptions by stepparent, grandparent; consent
If the spouse of the petitioner is the legitimate parent of the child or if the petitioner is the grandparent or grandparents of the child, then the consent of the other legitimate parent is not necessary when the spouse of the petitioner has been granted either sole or joint custody, or when the grandparent or grandparents, or the mother or the father has been granted sole custody of the child by a court of competent jurisdiction, and if any one of the following conditions exists:
(1) The other legitimate parent has refused or failed to comply with a court *1387 order of support for a period of one year....
A court may not properly grant an adoption merely because one of the conditions of LSA-R.S. 9:422.1 has been met, and the necessity of the natural parent's consent has been dispensed with. The court must still satisfy itself that the adoption is in the best interest of the child. Adoption of Latiolais, 384 So.2d 377 (La.1980); In re Hinton, 390 So.2d 972 (La.App. 2d Cir. 1980), writ not considered, 396 So.2d 1350 (1981).
In a stepparent adoption proceeding, a dual focus is appropriate in determining the best interest of the child. It is not enough to examine the love and home environment provided by the stepparent. It is necessary as well to examine the depth and closeness of the child's ties with the noncustodial natural parent, and the effect which the loss of the relationship would have on the child. In re Glass Applying for Adoption, 424 So.2d 383 (La.App. 2d Cir.1982); In re EWB Applying for Adoption, 441 So.2d 478 (La.App. 2d Cir.1983).
Whether an adoption is in the best interest of the child must be decided on the facts of each case and the trial judge is vested with great discretion in making that determination. In re Hinton, supra; In re Glass, supra. This discretion is not absolute and the trial judge's determination of best interest is subject to reversal if the record reveals it is manifestly in error or clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989).

Assignment of Error No. 1:
ED does not challenge on appeal the correctness of the trial court's finding that he failed to pay child support for one year nor the related finding that his nonsupport was unjustified. Instead, he urges that the trial court erred by failing to find that LSA-R.S. 9:422.1 unconstitutionally imposes punishment on a nonpaying parent and that such punishment is unconstitutionally excessive. In essence, he argues that forfeiture of one's parental rights in an adoption proceeding due to nonsupport is tantamount to an excessive criminal sanction and as such is unwarranted by the facts of this case.
The constitutionality of a statute must first be questioned in the trial court, not the appellate court. Brown v. Williams, 587 So.2d 732 (La.App. 2d Cir.1991). The plea of unconstitutionality must be specifically pleaded to be considered by the court. Johnson v. Welsh, 334 So.2d 395 (La.1976); Davis v. Franklin Parish School Board, 412 So.2d 1131 (La.App. 2d Cir.1982), writ denied, 415 So.2d 942 (La.1982). The burden of proof rests with the party who is challenging a statute's constitutionality to prove clearly that the statute is in conflict with a specific provision of the constitution. In the Interest of J.M., 590 So.2d 565 (La. 1991).
No assertion of unconstitutionality was pleaded by ED at any time prior to the trial court's ruling on the merits on January 16, 1991. This issue was raised for the first time in a motion styled "First Supplemental Motion for New Trial" filed April 24, 1991, over three years after the last day of the trial, April 18, 1988. Further, where the constitutionality of a statute is at issue, the Attorney General must be served and is an indispensable party. LSA-C.C.P. Art. 1880; Lemire v. New Orleans Public Service Inc., 458 So.2d 1308 (La.1984). The Attorney General was never served with a copy of the motion for new trial nor was he a party to the action at any time.
Assuming arguendo that these contentions should be addressed by this court, we find no compelling authority that the statutory scheme is unconstitutional. ED has cited no persuasive legal authority in support of his argument. This court, in In re Coile, 343 So.2d 325 (La.App. 2d Cir.1977), writ denied, 345 So.2d 902 (La.1977) expressly rejected dissimilar claims that the statute was unconstitutional. LSA-R.S. 9:422.1 was considered in detail by the Supreme Court in the Adoption of Latiolais, supra and has been applied numerous times by intermediate appellate courts. See In re Glass Applying for Adoption, supra footnotes 1, 2, and 3. It is axiomatic that nonsupport is only one of the conditions *1388 required by R.S. 9:422.1 that may lead to a termination of parental rights. It is equally well settled that a court may find that a parent has lost his or her natural right to oppose an adoption without finding that an adoption is in the best interest of the child. ED makes no argument that the trial court's granting of the adoption was based solely on his nonpayment of child support.
In short, the case in its present posture does not justify the exercise of a de novo constitutional analysis by this court. This assignment lacks merit.

Assignment of Error No. 2:
ED's second assignment of error contends that the trial court erred in finding that the granting of the petition for adoption was in the best interest of the minor child, JT.
In the instant case, the record is replete with evidence that supports the trial judge's conclusion that granting of the adoption was in the best interest of the child. In determining the best interest of JT, the court considered (1) the fitness of the prospective adoptive parent, RT, and (2) the relationship between the natural parent, ED, and the child.
Regarding the first element, ED stipulated through counsel that "... Dr. [T] is a good person, a good stepfather, a good parent, and that he feels very fortunate that the child has him as a stepfather, so that he will not have to worry about establishing suitability." Additionally, the trial court noted that JT had lived with RT and CT since the date of their marriage in June 1981. Though RT had a busy medical practice, the record establishes that RT was actively involved in the sports activities and academic pursuits of JT. RT worked with JT in cub scouts, science fair projects, field days, and numerous other school activities. He was a member of the PTA at every school JT attended.
The testimony is uncontradicted that JT had a normal sibling relationship with the two children born of the marriage of RT and CT. The three children were all treated as loving members of the family and attended church and other activities together. The cumulative testimony established that RT was a loving stepparent of JT and in all respects, treated JT as his own son. Interestingly, JT referred to RT as his dad and to his natural father by the father's given first name. The trial court's conclusion that a close, nurturing relationship, with mutual love and respect had developed between RT and JT is amply supported by the record. We find no error in the trial court finding that RT was well suited as a prospective adoptive parent.
The trial court duly considered the effect of the adoption on the relationship between the natural parent, ED, and the child, JT. The court concluded that the relationship between ED and JT was not a stable or consistent one. The testimony accepted by the trial court shows that following the separation of the natural parents, the frequency and degree of contacts between ED and JT decreased. Generally, visitation was requested by ED's parents or other relatives and not by ED himself. Even when ED lived in Arcadia reasonably close to JT's location, he did not often visit JT. When ED was told of JT's behavioral problems, he chose not to participate in the resolution.
Moreover, there are several incidences described in the record where JT became frightful concerning his contacts with ED. The episode of November 13, 1987 wherein ED abducted JT from his home, is typical of a number of occasions in which the child was adversely affected by ED's erratic temperament. ED's physical abuse of CT in the presence of the child vividly demonstrates his utter disregard for the traumatic impact his actions had on JT. These events make it obvious that any meaningful parenting bond that existed between ED and JT had long since dissipated prior to the filing of the adoption petition.
Dr. Gerald Baker, a clinical psychologist, gave expert testimony that JT had a clear paternal identification with RT. It was Dr. Baker's opinion that JT clearly felt that RT was his father and that RT had spent meaningful time with him and interacted with him in the manner one associates with *1389 a father. JT had a clear affection for RT and enjoyed his company and felt comfortable. In effect, Dr. Baker opined that JT considered RT as his father. By contrast, Dr. Baker opined that as early as October 1987, it was clear to him that contacts between ED and JT were counterproductive. He opined that the relationship was strained to a point that JT was often caused to be agitated for long periods of time and even fearful of contacts with ED. Dr. Baker further testified that an extensive degree of psychotherapy would have been required to reestablish any meaningful relationship between JT and ED.
Finally, it is clear from JT's testimony that he understood the nature of the adoption proceeding and wanted to be adopted by RT.
The trial court resolved the credibility choices in favor of the petitioner, RT. Its conclusion that there was no bond between ED and JT that the court should protect by refusing to allow the adoption was neither manifestly erroneous nor clearly wrong. We hold that it was in the best interest of the child, JT, to sever the parental relationship with ED.

Assignment of Error No. 3:
ED, in his third assignment of error, contends that the trial court erred by admitting post-petition evidence relating to three incidents which occurred after the petition for adoption was filed: (1) the football game incident; (2) the school bus incident, and (3) the abduction incident. The details of the school bus and abduction incidents are set forth in the factual chronology of this opinion. The football incident involved ED's unannounced attendance at one of JT's football games. ED behaved erratically which caused JT to become upset.
At trial, the Juvenile Court allowed testimony concerning the three incidents. ED contends that such testimony prejudiced him inasmuch as it expanded the pleadings without notice by amendment. The Juvenile Court overruled ED's objection on this point, noting that the issue of best interest of the child is broad enough that the court should have the benefit of all the information it can get with respect to any relationship between the child and the natural parent. We affirm.
Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. State v. Ludwig, 423 So.2d 1073 (La.1982); See also LCE Art. 402. A trial court has the discretion to admit or disallow evidence subject to an objection based upon the scope of the issues and pleadings. Additionally, it is discretionary for the trial judge to determine whether the evidence is encompassed by the general issues raised in the pleadings. Brannon v. Boe, 569 So.2d 1086, 1088 (La.App. 3d Cir.1990); Coutee v. American Druggist Insurance Co., 453 So.2d 314 (La.App. 3d Cir.1984), writ denied, 458 So.2d 477 (La.1984).
Evidence of subsequent contacts of ED with JT was relevant to the pivotal issue of the best interest of the child. Inherent in the court's consideration was whether there was any real probability that JT could enjoy and benefit from a continuing relationship with his father, ED. In re Hinton, supra. The testimony concerning the three incidents was offered as additional proof of the nonexistence of a parent-child relationship between ED and JT. Under these circumstances, such testimony did not expand the pleadings. The trial judge did not abuse his discretion in admitting the testimony. This assignment is meritless.

CONCLUSION
Based on the foregoing, we affirm the trial court judgment decreeing the adoption of JT by the petitioner, RT. All costs are assessed to appellant.
AFFIRMED.