# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 22-141

**W.P.H. APPLYING FOR ADOPTION OF**

**A.A.B., E.J.B. AND G.K.B.**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
THIRTY-FIRST JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON DAVIS, NO. A-13-19
HONORABLE CRAIG STEVE GUNNELL, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**SHANNON J. GREMILLION**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Shannon J. Gremillion, D. Kent Savoie, and Sharon Darville
Wilson, Judges.

**REVERSED AND RENDERED.**

Jack Derrick Miller
Attorney at Law
P. O. Box 1650
Crowley, LA 70527
(337) 788-0768
COUNSEL FOR APPELLEE:
     W.P.H.

Dylan T. Heard
Vincent Law Offices, APLC
P. O. Box 450
Crowley, LA 70527-0450
(337) 783-7777
COUNSEL FOR APPELLANT:
     N.B.

Alexander J. Guinn
Heinen & Guinn Law Firm & Consulting, LLC
407 N. Church Street
Jennings, LA 70546
(337) 246-7220
COUNSEL FOR:
     A.A.B.
     E.J.B.
     G.K.B.

**GREMILLION, Judge.**

The biological father, N.B., appeals the trial court's judgment terminating his parental rights and allowing his three children to be adopted by their step-father, W.P.H. For the following reasons, we reverse and render.

## FACTUAL AND PROCEDURAL BACKGROUND

W.P.H. filed a petition for adoption of A.A.B., E.J.B., and G.K.B. (the children), the biological children of his wife, J.H., on October 28, 2019, asserting that N.B. had failed to visit his children for more than six months and failed to pay child support for more than six months. At that time, A.A.B. was ten years old (DOB: 3/16/2010), E.J.B. was eight years old (DOB: 9/24/2011), and G.K.B. was six years old (DOB: 9/23/2013). N.B. and J.H. were married in 2005 and divorced in April 2016. J.H. had been the domiciliary parent since February 2015. She and W.P.H. married in November 2016, and the children have resided in W.P.H. and J.H.'s marital home since then. N.B. was ordered to pay child support of $750.00 per month retroactive to May 15, 2015.

On October 28, 2019, the trial court signed an order directing the Jefferson Davis Parish Sheriff's Office to conduct a criminal records search on W.P.H. and provide a certificate to the trial court indicating all information discovered or that no such information had been found.

The petition for adoption was mailed to N.B. at an address in North Carolina. N.B. filed a declinatory exception of insufficiency of service of process urging that the North Carolina address was not his domicile, dwelling house, or usual place of abode in accordance with La.Ch.Code art. 1248. The trial court overruled the exception, and N.B. filed writs with this court. On January 10, 2020, N.B. accepted service of the petition.

On January 27, 2020, N.B. filed an Opposition to Intrafamily Adoption. On February 21, 2020, N.B. filed a motion and order to reset the adoption hearing, urging that an attorney had not been appointed to represent the children in accordance with La.Ch.Code art. 122.1(B). On June 1, 2020, N.B. filed a motion for a mental health evaluation of the parties. On June 3, 2020, N.B. filed a motion to dismiss the petition for intrafamily adoption pursuant to La.Ch.Code art. 1253, which requires a hearing within ninety days of the petition being filed, arguing that the hearing was scheduled seventy days too late, even considering a sixty-day "good cause" extension allowed by law.

Following a hearing, the trial court, in a "Post-trial Memorandum" filed on June 18, 2020, found that it was undisputed that N.B. had failed to pay child support from August 2017 through the filing of the petition in October 2019 without just cause, that N.B. had abandoned the children to the sole care of J.H. and W.P.H., that texts and the occasional phone call did not qualify as significant contact, and that it was in the best interest of the children to allow W.P.H. to adopt the children. The trial court found W.P.H. "checked off all of the boxes, particularly when speaking of the spiritual guidance he exhibits with his family." It further found that W.P.H. was morally fit and would raise the children "in a wholesome, Catholic environment." In its "Reasons for Ruling," the trial court found that N.B. had only paid child support twice in the five years since his divorce, without just cause, and that he had essentially abandoned the children.

On July 14, 2020, N.B. filed a motion to recuse Judge Gunnell and remove Kevin Millican, who was an assistant district attorney who announced his candidacy for district attorney, which was denied. N.B. filed a supervisory writ with this court. We denied the writ. A final decree of adoption was filed on August 24, 2020. On

2

September 1, 2020, N.B. filed a motion for new trial, which was denied.  N.B. then appealed.

On March 10, 2021, a panel of this court, in an unpublished opinion, vacated the judgment granting adoption and remanded to the trial court because the requirements of La.Ch.Code art. 1243.2  and 1253(B)(4) were not strictly complied with since a criminal record report or report regarding complaints of child abuse or neglect was not submitted as evidence at the hearing  *In re: W.H. Applying for Intrafamily Adoption of A.A.B., E.J.B., & G.K.B.,* 20-515 (La.App. 3 Cir. 3/10/21) (unpublished opinion).

On June 15, 2021, N.B. filed a motion to dismiss intrafamily adoption arguing that our judgment vacating the judgment required a retrial with service anew and that time delays had expired.  The trial court denied the motion on June 16, 2021, and N.B. filed a supervisory writ with this court.  A June 24, 2021 motion and order to stay trial proceedings was filed by N.B.  Attached to it was the May 27, 2021 judgment by the Fifteenth Judicial District Court in a separate proceeding that found J.H. in contempt of court for her "willful refusal to allow contact with the minor children and custodial time to N.B. and her failure to comply with the joint custody plan and to provide him with information regarding the minor children."  This ruling followed a May 12, 2021 hearing on a rule for contempt filed by N.B. on January 16, 2020.  The Fifteenth Judicial District court found J.H.'s:

> actions in joining her husband's attempt to adopt N.B.'s children is the ultimate attempt by a parent to erase another parent from a child's life and thwart N.B.'s efforts to see his children.  The adoption proceeding shows J.H.'s willful, intentional, purposeful violation of the joint custody plan.  The Rule for Contempt was filed January 16, 2020, and is just being heard.  J.H. was aware that N.B. was proceeding with his Rule and his attempts to see his children.  N.B. did not see his children in all of 2020.  J.H. is guilty of a willful violation of the court order which is not supported by justifiable excuse.

On July 19, 2021, after the remand, the trial court found that the requirements of La.Ch.Code art. 1243.2 had been met, terminated N.B.'s parental rights, and granted W.P.H.'s petition for intrafamily adoption. On July 30, 2021, N.B. filed a motion to strike reasons for ruling and reset the matter for hearing to allow him the opportunity to be heard, which the trial court denied.

Following a Zoom hearing on September 29, 2021, the trial court rendered judgment on October 26, 2021, terminating N.B.'s parental rights, granting the adoption by W.P.H., and ordering new birth certificates and social security cards for the children. N.B. filed a motion for new trial which was denied. N.B. now appeals.

## ASSIGNMENTS OF ERROR

N.B. assigns as error:

1. The Court erred in granting the adoption without considering the best interest of the child factors, the relationship between the children and their father, or the effect on the children of severing that relationship.

2. The Court erred in finding that it was in the children's best interest to terminate their father's parental rights.

3. The Court erred in finding that N.B. had failed to pay an order of support for a period greater than six months.

4. The Court erred in finding that N.B. did not have just cause for his failure to pay support for a period of greater than six months.

5. The Court erred in denying N.B.'s motion to dismiss the adoption on the basis that the hearing was not being held within the allowable time.

6. The Court erred in denying N.B.'s motion for mental health evaluations of the children and the parties.

7. The trial court erred in denying appellant's motion for directed verdict at the June 4, 2019 hearing.

8. The trial court erred in failing to issue the orders requiring criminal background checks and checks for complaints of child abuse and/or neglect immediately upon remand as required by La.Child. Code Ann. Art. 1243.2 and specifically ordered by this Court.

9. The trial court erred in admitting the November 8, 2019, background check that W.P.H. failed to admit in the original proceedings.

4

10. The trial court erred in admitting the May 18, 2021, background check that W.P.H. failed to admit in the original proceedings.

11. The trial court erred in admitting the November 13, 2019, background check that W.P.H. failed to admit in the original proceedings.

12. The trial court erred in excluding the testimony of Walter Camos, LPC at the September 29, 2021 hearing.

13. The trial court erred in excluding the Judgment and Reasons for Ruling issued by the trial court exercising jurisdiction over the custody proceedings of the children in this matter.

14. The trial court erred in failing to find that the intrafamily adoption statutes violate the equal protection clause of the United State[s] Constitution and are therefore unconstitutional.

## DISCUSSION

The permanent elimination of a parent's rights and obligations by judicial order requires consent of both parents unless "consent has been dispensed with by law." *In re K.L.H.*, 99-1995, pp. 2-3 (La.App. 3 Cir. 9/20/00), 771 So.2d 706, 708. A stepparent can petition to adopt the children of the mother. La.Ch.Code art. 1243(A). When a petition for intrafamily adoption is filed, the court "shall immediately issue both of the following orders:"

> (1) That the local sheriff or the office of state police, Louisiana Bureau of Criminal Identification and Information, conduct a records check for all federal arrests and convictions and all state arrests and convictions for each of the prospective adoptive parents. Prospective adoptive parents shall submit a set of fingerprints to the sheriff or the office of state police.

> (2) That the department conduct a records check for validated complaints of child abuse or neglect in this or any other state in which either of the prospective adoptive parents has been domiciled since becoming a major, involving either prospective adoptive parent.

> B. Each order shall state the full name, date of birth, social security number, and former and current state of domicile since becoming a major of each prospective adoptive parent.

> C. The sheriff or the office of state police, Louisiana Bureau of Criminal Identification and Information, and the department shall

5

accord priority to these orders and shall provide a certificate indicating all information discovered, or that no information has been found.

La.Ch.Code art.1243.2.

A parent's consent is not required when the petitioner shows by clear and convincing evidence the elements of either La.Ch.Code art. 1245(B) or 1245(C), which state:

B. When a petitioner authorized by Article 1243 has been granted custody of the child by a court of competent jurisdiction and any one of the following conditions exists:

(1) The parent has refused or failed to comply with a court order of support without just cause for a period of at least six months.

(2) The parent has refused or failed to visit, communicate, or attempt to communicate with the child without just cause for a period of at least six months.

C. When the spouse of a stepparent petitioner has been granted sole or joint custody of the child by a court of competent jurisdiction or is otherwise exercising lawful custody of the child and any one of the following conditions exists:

(1) The other parent has refused or failed to comply with a court order of support without just cause for a period of at least six months.

(2) The other parent has refused or failed to visit, communicate, or attempt to communicate with the child without just cause for a period of at least six months.

La.Ch.Code art. 1245.

The children's code requires a parent receive notice as follows:

A. Except when waived in accordance with the provisions of Title XI or XII, notice of the filing of the petition for intrafamily adoption shall be issued by the clerk and served, together with a copy of the petition, on every parent whose consent to the adoption is required pursuant to Article 1193 and whose parental rights have not been terminated by a court of competent jurisdiction, and shall state:

Notice
Louisiana law provides that under certain circumstances your consent to the adoption of your child may be dispensed with and you can permanently lose your rights as a parent by final decree of adoption. An intrafamily adoption petition has been filed requesting the court to grant an adoption and terminate your parental rights to your child. A

copy of the petition is attached to this notice. If you do not file a written answer stating your opposition to the adoption within fifteen days of receiving this notice you will lose the right to object to the adoption. If you choose to file a written answer stating your opposition to the adoption you must file it with the clerk of court at _____. Only if you file an answer stating your opposition to the adoption will you have an opportunity to present your opposition to the adoption. If you file an answer stating your opposition, the court will set a hearing, and you will receive notice of the hearing of your opposition.

If you do not file an answer stating your opposition, and if the court at the adoption hearing finds that the facts set out in the petition are true and that adoption is in the best interests of your child, the court can enter a judgment ending your rights to your child. If the judgment terminates your parental rights, you will no longer have any rights to visit or to have custody of your child or make any decisions affecting your child, and your child will be legally freed to be adopted.

This is a very serious matter. You should contact an attorney immediately so that he or she can help you determine your rights. You have the right to hire an attorney and to have him or her represent you. If you cannot afford to hire an attorney and you oppose the adoption, your answer stating your opposition may request that the court determine if you have the right to have an attorney appointed. If you have filed an answer stating your opposition, whether or not you decide to hire an attorney, you will have the right to attend the hearing of your case, to call witnesses on your behalf, and to question those witnesses brought against you.

You may call the telephone number on the attached form for information concerning free legal aid. If you have any questions concerning this notice, you may call the telephone number of the clerk's office which is _____.

B. If the adoption petition names an alleged or adjudicated father and his parental rights have not been terminated by a court of competent jurisdiction, he shall be served with notice of the filing of the petition in accordance with Articles 1133, 1134, and 1136 and thereafter, his rights shall be determined in accordance with the provisions of Articles 1137 through 1143.

La.Ch.Code art. 1247.

The hearing of the petition for intrafamily adoption must be had in accordance

with the following rules:

A. The court shall hear the petition for intrafamily adoption within sixty days if there is no opposition or within ninety days if there is opposition. The court may extend this time for up to sixty days for good cause, which may include a showing by the department that it has been

impossible to gather the necessary data within the time prescribed. The court may reduce the time to a minimum of fifteen days with written approval of the department and the petitioner.

B. At this hearing the court shall consider:

(1) Any motion to intervene which has been filed.

(2) Any other issues in dispute.

(3) The confidential report of the department, if any.

(4) The report of any criminal records concerning the petitioner, including the nature of the offenses, the number of offenses, and the length of time between the offenses and between the last offense committed and the petition for intrafamily adoption. The existence of a criminal record of the petitioner shall not be automatic grounds for the court to refuse to grant an intrafamily adoption.

(5) The report of any validated complaints of child abuse or neglect concerning the petitioner.

(6) The testimony of the parties.

C. If the child to be adopted is twelve years of age or older, the court shall solicit and consider his wishes in the matter.

La.Ch.Code art. 1253.

Louisiana Children's Code article 1255 provides (emphasis added):

A. The court, as a part of the final decree, shall provide notice of the provisions of R.S. 14:46.4 to the parties.

B. The court, after hearing and after taking into consideration information from all sources concerning the intrafamily adoption, may enter a final decree of adoption, or it may deny the adoption. *The basic consideration shall be the best interests of the child.*

C. When a court has granted custody to either the child's grandparents or his parent married to the stepparent petitioner, there shall be a rebuttable presumption that this adoption is in the best interests of the child.

### *Procedural Matters*

While N.B. assigns a number of errors addressing procedural irregularities, we find these issues are rendered moot by our finding that it would not be in the best interests of the children to terminate N.B.'s parental rights.

8

Although not necessary to our ruling, we will briefly address the requirements of La.Ch.Code art. 1245(C)(2), which, if met, dispense with consent of the biological parent when a stepparent petitions for intrafamily adoption. A positive finding that either of these conditions is met does not dispense with the best interest determination of the children. W.P.H. bore the burden of proving by clear and convincing evidence that N.B.'s consent was not required. Only then does the burden shift to N.B. to prove that he could not exercise visitation or pay support due to factors beyond his control. *In re: D.L.D.*, 53,758 (La.App. 2 Cir. 1/13/21), 310 So.3d 314.

### Child Support

It has never been the law of Louisiana that the failure to pay child support alone is sufficient to terminate a biological parent's rights, even if without just cause, if the termination of parental rights is not in the children's best interest. *In re K.L.H.*, 771 So.2d 706; *Adoption of Latiolais*, 376 So.2d 555 (La.App. 3 Cir. 1979),*writ granted*, 379 So.2d 11 (La.1980), *aff'd*, 384 So.2d 377 (La.1980); *Leger v. Coccaro*, 98-202 (La.App. 3 Cir. 4/29/98), 714 So.2d 770, *writ denied,* 98-1423 (La. 7/2/98), 724 So.2d 740. Whether N.B. had just cause is subject to manifest error review. *In re K.L.H.*, 771 So.2d 706. We have addressed this issue before and, while we do not condone N.B.'s failure to pay, N.B. did make a lump sum payment of the arrearages owed. Further, as discussed in the testimony below, N.B. faced employment challenges due to being laid off and because of his disbarment and depression. While we might have found that there was just cause for N.B.'s failure to pay, based on the evidence in the record, a reasonable factfinder could conclude that N.B. stopped paying child support once J.H. refused to let him see his children. Accordingly, we cannot find that the trial court manifestly erred in finding that N.B. did not have just

cause. Nevertheless, we do not find the best interest of the children would be served by severing relations with N.B.

### *Contact/Abandonment*

Next, the trial court found that N.B. "abandoned" his children by not having contact with them for a period of more than six months. As discussed further below, there is overwhelming evidence in the record that J.H. prevented N.B. from exercising visitation. The trial court that heard the contempt motion filed by N.B. found a concerted effort was underway by J.H. and W.P.H. to prevent N.B. from seeing his children. It found J.H. in contempt for unilaterally discontinuing a court-ordered visitation plan and ordered N.B.'s visitation with his children to resume. After reviewing the testimonial evidence of J.H., a reasonable factfinder could not conclude that N.B. abandoned his children, but was instead prevented by J.H. from visiting them in person and contacting them by phone calls or texts. Again, however, it is not necessary for us to find that the trial court manifestly erred in its findings relating to the requirements of La.Ch.Code 1245(C)(2), because it is not in the best interest of the children to have their father's parental rights terminated.

### *Best Interests*

The best interests of the children are the paramount concern in all cases involving the custody of children, including stepparent adoptions and the termination of the parental relationship. *Latiolais*, 376 So.2d 555; *In re K.L.H.*, 771 So.2d 706. In *Adoption of Latiolais*, 384 So.2d 377, 378 (La. 6/23/80), the supreme court affirmed the court of appeal's ruling reversing the trial court's grant of adoption in favor of the stepparent and stated that, "The best interest of the child is the major standard to which a court must look before it can determine when or whether to order an adoption." Even if W.P.H. had proven by clear and convincing evidence that N.B.'s consent was not required because he failed to support or visit

his children for a period greater than six months, we find the trial court manifestly erred in finding that it would be in the children's best interest to terminate their biological father's parental rights.

As we noted in *In re K.L.H.* 771 So.2d 706 at 709:

> Whether an adoption is in the best interest of the child must be decided on the facts of each case, and the trial judge is vested with great discretion in making that determination. *In re Farrar*, 93-1347 (La.App. 3 Cir. 4/6/94); 635 So.2d 674. However, this discretion is not absolute and the trial judge's best interest determination is subject to reversal if the record reveals it was manifestly erroneous. *Latiolais,* 384 So.2d 377.

In *In re Farrar*, 93-1347 (La.App. 3 Cir. 4/6/94); 635 So.2d 674, 676-77, a panel of this court summarized the applicable law pertaining to intrafamily adoption:

> In reviewing the law in the area of adoption, we note that there is no clear definition or absolute outline of factors that should be used in determining what is in the best interest of a child. Louisiana courts have cited several factors including the ability of the stepparent to serve as parent, the ability of the stepparent to provide for the child's physical needs, the stepparent's ability to fulfill the psychological needs of the child, and lastly, whether the aforementioned considerations outweigh the existent natural parent-child relationship. *In re Billeaud,* 600 So.2d 863, 865 (La.App. 3d Cir.1992). More specifically, where a stepparent is married to the natural parent having custody and seeks to adopt that child, Louisiana courts have held:
>
>> The most important factors are the child's relationship with h[is] stepfather and h[is] natural father. *It is not enough to examine the love and home environment provided by the petitioner/stepparent.* It is necessary as well to examine the depth of closeness of the child's ties with the non-custodial natural parent, and the effect which the loss of this relationship would have on the child. *In Re JGG v. JLF,* 556 So.2d 236 (La.App. 2d Cir.1990). The court must also consider the seriousness and finality of the severing of the relationship between the parent and child, as well as the importance and benefit to the child of a continued relationship with the parent. *Id.*
>
> *Knapp v. Adoption of Cotten,* 577 So.2d 241, 246 (La.App. 1st Cir.), *writ denied,* 580 So.2d 364 (La.1991). Consequently, a court, for example, cannot automatically grant a stepparent's petition for adoption even where the relationship between a stepfather and his stepson is closer and more affectionate than the relationship between the son and his natural father. The law requires that the court also

11

evaluate the relationship between the child and the natural parent and the effect on the child of severing the natural parent-child relationship.

This court has previously addressed the importance of the natural parent-child relationship. In *Latiolais*, which was affirmed by the Louisiana Supreme Court, we pointed out that an adoption terminates any right of visitation between the child subject to the adoption and the non-custodial natural parent. *Adoption of Latiolais*, 376 So.2d 555, 560 (La.App. 3d Cir.), *affirmed*, 384 So.2d 377 (La.1980). In reviewing a stepparent's petition for adoption and the effect on the natural parent-child relationship, this court held: "[Granting the petition for adoption] would be tantamount to a pronouncement of death between them." *Latiolais, supra.* This death in the natural parent-child relationship would extend to the entire family of the natural parent. *Latiolais, supra.* In an adoption, a child's family name changes and he becomes a new legal person with no legal ties to his natural family. In the Louisiana Supreme Court's opinion affirming our decision in *Latiolais,* the court referred to the issue of the rupture of the natural parent-child relationship as a crucial factor in determining the best interest of the child. *Adoption of Latiolais,* 384 So.2d 377, 378 (La.1980).

In another Louisiana Supreme Court case, the court again addressed the importance of the biological relationship. Although this case involved a private adoption, its discussion of general policy considerations is relevant and helpful in determining the appropriate weight to give to the natural parent-child relationship.

> Under broadly shared social values the general rule is that the responsibility and opportunity of custody is assigned to a child's natural parents. The high value placed on family autonomy reflects a consensus that *the natural parent-child relationship should be disturbed only if necessary to protect the child from physical or psychological harm.* Moreover, preservation of the child's sense of lineage and access to his extended biological family can be important psychologically, as evidenced by the felt need of some adoptive children to search out their natural parents.

*In re J.M.P.,* 528 So.2d at 1015.

"Louisiana courts have historically been reluctant to sever the parent-child relationship and derogate from the natural rights inherent therein since the jurisprudence recognizes the fundamental belief that a child has a right to know and love his parents and such rights should not be denied except when the parent has proven himself unworthy of this love." *Billeaud,* 600 So.2d at 866 (citations omitted); *see also, Hinton,* 390 So.2d 972 (holding petitioner must show that the denial of a petition for adoption, which would rupture the natural parent-child relationship, would operate to the detriment of the child). In cases

similar to the one before this court, i.e. 1) where a stepparent is married to the natural parent having custody, 2) a stepparent's relationship with stepchild is excellent, and 3) a stepparent seeks to adopt that child, Louisiana courts have adhered to the presumption that maintaining the natural parent-child relationship is in the best interest of the child unless petitioner shows otherwise.

In order to rebut the presumption that it is in the best interest of the child to keep open or continue the natural parent-child relationship, Louisiana courts have required that the petitioner establish one of the following: 1) no natural parent-child relationship exists, 2) the natural parent is indifferent about the child's well being, or 3) the natural parent's visits with the child have been sporadic and inconsistent.

(Footnote omitted)(emphasis added); see also *In re K.L.H.*, 771 So.2d 706.

*Testimony*

**June 4, 2020 hearing**

J.H. testified she lived in a "pretty large home" on several acres of yard and many acres of farm and barns with a lot of space for "the good country life." She stated that she had been married to W.P.H. since November 2016, and that seven children resided in the home, two children of W.P.H. from a previous marriage, the three children in question, and two children born of W.P.H. and J.H.'s marriage. The children ranged in age from seventeen years old to eleven months old. J.H. said that she and W.P.H. teach catechism and lead the youth group at the church they attend. She said that she and N.B. have been divorced since January 2015. Although J.H. offered no evidence other than testimony, she stated that N.B. had never regularly paid child support. J.H. testified that the last time N.B. saw the children was in October 2018, shortly before a warrant for his arrest for non-payment of child support was issued. She stated she brought the children to N.B.'s father's funeral in December 2018, and that was the last time he saw them as of the date of the trial. Prior to October 2018, N.B. would pick up the children from a gas station and keep them from Friday through Monday morning, every other weekend.

13

On November 9, 2018, J.H. refused to deliver the children to N.B.'s sister at the gas station. J.H. testified at trial that the children were not with her at the meeting and that she had made a mistake in her deposition testimony when she stated that they were. N.B.'s sister arrived to pick up the children, but J.H. sent text messages to N.B. refusing to allow his sister to pick them up (the children were not present physically to be picked up). J.H. testified that she was advised by the sheriff's office to refuse visitation because N.B. was a flight risk, and it would be difficult to get the children back from North Carolina, where N.B.'s girlfriend lived. According to J.H., the children requested to use J.H.'s married last name. She testified when asked how the children have responded to not having contact with N.B. since December 2018:

> . . . we took each kid individually and sat down with them and explained them – to them that [N.B.] was in trouble and to keep them safe that they would not be talking to him anymore on the phone and – but if they had any questions at any time whether it be now at the time we were talking, a year from now, two, three years from now, or weeks from now, whenever that they – we would always be open to talk to them any time they wanted.

J.H. was asked if she intentionally attempted to prevent N.B. from his court-ordered visitation with his children prior to the filing of the intrafamily adoption, to which she responded, "No, sir. He was allowed to visit. Even with no child support, he was still allowed to have visitation and communicate with them on the phone."

On cross examination, J.H. was questioned why N.B. had not spoken to the children since December 2019, to which she responded:

> After one of the court appearances here when [N.B.] was again a no show with my motherly instincts and for their protection – and the warrant was put out, and with my motherly instincts and protection and interest of the kids, I wanted to protect them and inquired if I could cease communication with them.

J.H. testified that her attorney told her it would be "fine" if she ceased communicating with N.B. She thereafter blocked N.B.'s phone number and all communication he had with the children. J.H. stated she feared N.B. would flee with

the children if in-person contact was made.  Regarding telephone contact, J.H. stated that an intrafamily adoption was going on and she wanted to protect the children "from anything he would have told them," and to protect them from "misinformation."  However, she stated that she did know what kind of misinformation, she was just being "proactive."  J.H. also blocked all of N.B.'s family members' phone numbers to prevent "misinformation."  J.H. was asked to read aloud a portion of the joint custody plan which stated:

> The children should have complete and full access to communication with each parent.  No communication shall be intercepted, censored, or monitored.  Both parents shall not restrict the right of the other parent without physical custody to reasonable telephone access.

J.H. testified that she decided to ignore that provision in December 2019, once the intrafamily adoption process began.

J.H. admitted to informing the sheriff's office when N.B. was scheduled to be at the custody exchange.  She was questioned:

> Q. Did you use your children as bait in an attempt to have [N.B.] arrested?
>
> A. I let [the sheriff] know when [N.B.] was scheduled to pick up the kids for visitation.

J.H. admitted the children were not with her, and she had no intention of handing over the children that day.  J.H. then reviewed numerous messages in which N.B.'s sisters sent requests for the extended family, including cousins, to see the kids, but J.H. did not respond because she "had no interest."  She admitted that prior to November 9, 2018, N.B. had always exercised visitation with his children.

W.P.H. testified that he has been a farmer for twenty-one years.  W.P.H. said that he is involved in the day-to-day activities of all of the children and takes them hunting, four-wheeler riding, skeet shooting, fishing, golfing, and to baseball and

football games.  When questioned why he was seeking to adopt the children, W.P.H. stated:

> I guess lots of different reasons.  One, I want them to have the best possible raising.  You know, I --  I have a -- a strong I guess mindset that I can't stand the lies and the torment especially to a child much less to me.  When I first met the kids, there was no yes, sir, no, sir.  There was no shake your hand, look you in the eye.  Very – they didn't know – I mean, they were young but they didn't know how to drive any four wheeler, golf cart, very, very little, and they – and like I said, they were young, but I – I believe in teaching morals to kids.  Even my two year old, you know, if we were to meet prior to Covid I guess you tell him to shake his hands and you ask him where his eyes and he does that like (indicating).  My two year old knows that and they didn't know, you know, and not – not to their fault by any means, but just the right way to be a man, you know.  It kind of sounds cliché, but I'm not growing crops, I'm growing kids.

Regarding the November 9, 2018 pick up when the sheriff was present, W.P.H. testified that he is friends with the police and they called him personally to find out what was going on and:

> …they all told me if [N.B.] picks them up and leaves and was to get so much as a speeding tickets, the warrant  -- warrant would come up on- - you know, on his record and possibly could be hazardous for the kids to get the kids back and put the kids through a drama, and me and [J.H.] talked about it, and that was not what we wanted any of the kids or any kid to go through, and so we decided that's what we were going to do.

On cross examination, W.P.H. admitted that G.K.B had been driving the four-wheeler since she was three years old and that the ten and eight year old "drive my $200,000 tractor, eight wheel tractor, yeah."  W.P.H. had no problem with young children operating heavy farm equipment or driving four wheelers.  He believed if N.B. remained in the children's lives they would "have less morals."  W.P.H. believed that any parent with a failure-to-appear warrant is a danger to their children and that he and J.H. were justified in ignoring the custody order because the sheriff and his attorney told him to.

Two witnesses testified as to how involved W.P.H. is in the community and the children's lives.

16

Lauren Signorelli, the children's paternal aunt, testified that her five-year-old daughter had not seen the children in two years and asks about them often. Lauren then reviewed a number of messages she sent to J.H. asking if the children could visit her or her mom, their grandmother, especially since their grandfather had passed away, but J.H. did not respond. Lauren said that N.B. was not a danger to the children physically or emotionally and that they needed to have contact with their extended family on N.B.'s side.

Erin Bellard, N.B.'s sister, who has an eleven-year-old and seven-year-old, testified that all of the cousins were raised very close and would play together in the afternoons, but that they have not seen the children since her father's funeral. Similarly to Lauren, Erin reviewed text messages sent to J.H. expressing her affection for the children and wishing to see them, but received no response from J.H., even when she told J.H. that N.B. would not be present. Erin was of the opinion that the disappearance of her side of the family from the children's lives negatively impacted them because they were all very close. Erin said that N.B. did not abuse alcohol or drugs and posed no danger to the children mentally or physically.

Jane Bellard, N.B.'s mother, testified that she regularly saw the children and picked them up after school, and they would play on the family "compound" consisting of twenty-two acres where all of the family members resided. She said she had not seen the children in a year since E.J.B.'s communion, which they found out about from friends. Jane said that N.B. has no history of violence, alcohol, or drug abuse, and has never acted violently or excessively disciplined the children. She said he was a wonderful father who loved his kids. Jane said that since the divorce, N.B. has mainly lived with her and visited North Carolina. Jane testified that when N.B. and J.H. were married, J.H. would lock him out of the house after a

certain time and N.B. would have to come and sleep at her house. She said N.B. was not intoxicated when he arrived at her house.

Deputy Glenn Green of the Jefferson Davis Sheriff's Office testified that he has served N.B. twice. Deputy Green denied being present at the November 9, 2018 set-up and further denied telling Erin Bellard that she would not be able to pick up the children because N.B. had a warrant for his arrest.

Jason Joubert, N.B.'s friend of over thirty years and A.A.B.'s godfather, testified that N.B. was never a danger to his children, did not abuse drugs or alcohol, had no history of violence, and was never violent toward his children. N.B. is Joubert's son's godfather. Joubert believed that N.B. was a positive influence in the children's lives.

N.B. testified that he has lived in Church Point his entire life, except for the three years he attended law school in Baton Rouge. N.B. said the last time he saw his children was at his father's funeral and that he realized J.H. had blocked his phone number in mid-December 2019. N.B. said the last time he was able to exercise his visitation pursuant to the joint custody plan was in October 2018 when he brought the children to "Boo at the Zoo" in Baton Rouge. N.B. said he was unaware that a warrant was issued for his arrest for failing to appear and that it had been issued the day before the November custody exchange. N.B. said that warrants for failure-to-appear are issued in traffic citation cases and that people forget them all the time. Based on his experience as a city prosecutor and sometimes judge, he said that a failure-to-appear warrant does not make someone a danger to their kids.

N.B. described his three children in detail and testified about their births and how they were as infants. He commended J.H. as a mother and said that they were both good parents even as their marriage was falling apart.

N.B. testified that there are only two cousins on J.H.'s side of the family and they are much older than his children. He said the children were very close with his siblings' children and they were all similar in age. He reviewed many pictures of the cousins and his children together over the years.

N.B. said he has never had a problem with alcohol. N.B. was questioned regarding child support:

> Q. . . .Do you feel like you had just cause or was there any factors beyond your control that – that would have caused you not pay child support for a six month period?
>
> A. Starting in November of 2018, yes. I mean she basically just took the kids and wouldn't let me see them. I mean, at that point, yes. Before that, no. I was just broke. I mean, I had gone from practicing law to moving into another career. I literally at some point was just broke.
>
> Q. And what happened with – with your law career?
>
> A. Mike Harson loss [sic] reelection. All of us in Crowley lost our jobs at the DA's office, and my marriage was falling apart, and I was literally miserable. I woke up every morning hoping a bus would hit me, and I realized that nobody should live that miserable.
>
> Q. And these were all factors beyond your control?
>
> A. Yeah, they're why I went to the – they're why I went to the [Louisiana State] bar, and they're why I asked them to get me help. They're why they sent me to a psychiatrist for, you know, a year in Baton Rouge every two weeks. I just couldn't – and at some point, I just couldn't even face getting up in the morning anymore.

N.B. testified that he made five or six attempts to pick up his children after the November 9, 2018 event, but was always mindful that the police would be there. He would wait down the road, or his sister would go in the parking lot, but N.B. said J.H. never showed up with the kids so he stopped going. N.B. discussed his current employment consulting for an oil company on permit and other environmental issues. N.B. had been working in this position for a little over a year. N.B. agreed that he made limited child support payments: one lump sum payment in 2017 and another in January 2020. The January 2020 payment represented

19

arrearages from June 2018 through October 2019. He said he made another payment after January 2020. N.B. testified that he fully intended to exercise his visitation and was prevented from doing so from November 2018 forward. N.B. stated that he has no doubt that J.H. and W.P.H. are "great parents, but I still want to have a relationship with my children."

At the conclusion of the hearing, resuming visitation was discussed. The children's attorney stated "unless the Court sees some – some instances that – that it would be harmful to the children. I – I – I haven't heard any testimony to sustain that." The court responded: "No, I haven't seen any testimony that he would be harmful to the kids, and every testimony says he does not reside in North Carolina at this time, okay. So there's no – and there's no warrant out for him at this time, okay. That is my – my – my – my deal. So I'm going to allow visitation this weekend, alright." However, the trial court realized that the custody matter was not before it but was in a different parish—Acadia—and it could only address the adoption matter.

**June 29, 2021 hearing**

This hearing followed the remand from this court regarding the lack of mandatory criminal background check records being submitted into evidence. N.B.'s counsel argued:

> I object to the--the certificate of background check being introduced as evidence. The Third Circuit held in Treme that the record on remand cannot be corrected by admitting evidence that was not originally admitted. It can be corrected to introduce evidence that was admitted but not forwarded to the Third Circuit. But to admit evidence now that was not correctly and properly admitted into evidence just because it's in the record can't be done unless we were to have a-- a new hearing. That would not be consistent with the Third Circuit's opinion in this case on remand or with the Louisiana children's code.

The original criminal background check was done on November 17, 2019, but not admitted into evidence. After the remand, W.P.H.'s counsel had another

background check performed on May 18, 2021, which was admitted at the hearing. There were no records pertaining to complaints of child abuse, and the sheriff was unable to obtain those records, so the trial court recessed to contact the Department of Children and Family Services (DCFS). The hearing was continued to obtain records from DCFS.

**July 14, 2021 hearing**

Melissa Cardone testified that she conducted a child abuse neglect clearance for J.H. and W.P.H. and found no records of such. Cardone testified the request was received in November 2019 and no further inquiries have been conducted.

**September 29, 2021 hearing**

This hearing commenced with the trial court stating:

All right. Now, the last time we were in court I took a matter under advisement; however, it was only as to the directed verdict. That's what I have finally come to the conclusion. So as far as my ruling was concerned, I will – I am denying the motion for directed verdict, okay.

The plaintiff had presented their case.

Now, I ask the defense do they wish to present any evidence at this time.

N.B.'s counsel then advanced a constitutional argument, which the trial court denied. N.B.'s counsel then stated that, "pursuant to article 1253, defendants want to present the evidence and the testimony of Mr. Walter Camos," as to the best interests of the children. The trial court stated: ". . . the way the Court reads the opinion from the Third Circuit it was remanded for procedural not substantive issues, okay, so if you're wishing to call any witnesses in regard to trying the case over again, I'm going to deny that, okay." N.B.'s counsel then quoted our opinion in which we stated, "this matter is remanded to the trial court for proceedings consistent with the children's code and this opinion." Noting the broad language used, N.B.'s

21

counsel argued that evidence "from all sources" pursuant to La.Ch.Code art. 1255 must be considered before a final decree of adoption is entered. N.B. argued that Camos' testimony should be allowed in determining the best interests of the children. Camos is a licensed professional counselor.

The trial court replied: "All right. I understand your position. It's the same argument you've had before. Nothing has changed the Court's mind on this, okay. This is remanded back for procedural matters, and I'm not going to retry the case over again."

N.B.s counsel then proffered the testimony of Camos. At the conclusion of the testimony, the trial court asked if there was anything else. N.B.'s counsel sought to have the Judgment and Reasons for Ruling from the Fifteenth Judicial District Court finding J.H. in contempt for thwarting N.B.'s efforts to see his children admitted into evidence stating:

> I know you're not going to want to admit them into evidence, but it's my position that when you admitted the background check from May 18th that did not exist at the time of the original hearing, you opened the door for additional evidence that's offered by the defense.
>
> So, I'm going to offer the Judgment and Reasons for Ruling, certified copies of each, under the position that the door was opened for new evidence that the Third Circuit did not anticipate. When they remanded the case, I think the – the approach that Jack took was I'm just going to cross the T's and dot the I's that weren't done at the original hearings. But by introducing – by filing the amended order and admitting evidence that did not exist at the time of the original hearing, you opened the door to evidence from us, including the best interest of the child, as well as the order from this court as well.

The trial court stated, "The Court is not going to allow that into the record especially Reasons for Ruling, okay. No, the Court's not going to do it." It then allowed N.B.'s counsel to proffer the judgment and reasons for ruling.

Thereafter, the proffered testimony of Walter Camos, a licensed professional counselor, was entered into the record. Camos was ordered to conduct reunification

22

counseling for the children by the Fifteenth Judicial District pursuant to the children resuming visitation with their father following the hearing on N.B.'s contempt motion. Camos testified that the children were happy to see their father and would "get up and go walk over to him and hug him and lean on him with no prompting, just out of the blue." Camos opined that the children may fear the removal of him from their lives again. He said it was not something he normally sees children do. Camos said the children were "very happy" because they got to see their dad. Camos opined that the children loved both parents and expressed no preference for either. He stated:

> These are just genuinely awesome children. They are so loving. You can tell that they – they – they are compassionate and loving in the way they're just so nice and polite, so well behaved, and they love both of their parents is what I observed.

Camos opined that terminating N.B.'s rights would be a relationship trauma for the children. He did not discover abuse by either parent in this case. Regarding being reunited with their father, Camos said all three were delighted to see him again, they love him, and they want to spend time with him. Camos said N.B. was "very significant, very important, because [the children] – they seem to really love him, and they seemed to have missed him when he wasn't around." Camos stated that there was no real need for reconciliation therapy in this case because the children love N.B. and want to be with both parents. None of the children expressed feeling in danger when they are with N.B to according to Camos. He believed the children would be upset if they were not able to see N.B.

## TERMINATION OF N.B.'S PARENTAL RIGHTS

Due to the severity of terminating a parent-child relationship, adoption statutes are strictly construed in favor of the biological parent and against the stepparent seeking to adopt. *In re K.L.H.*, 771 So.2d 706. The trial court's finding

that W.P.H.'s home was preferred in terms of spiritual guidance and because J.H. was a stay-at-home mom is simply grossly insufficient to terminate a natural parent's fundamental right to his children. We agree with N.B. that the trial court and counsel seemed unclear as to the burden of proof required in a contested intrafamily adoption, which is significantly more stringent than determining the preferred household. W.P.H.'s statements in brief that the "trial judge easily found that the household of W.P.H. and [J.H.] is in the best interest of the children," and that "the question of which household and family was in the best interests of the children was clear and convincing to the trial judge" indicates his misunderstanding of the best interest standard. W.P.H.'s brief cites La.Ch.Code art. 1138, which does not pertain to intrafamily adoption but to surrender procedure by the biological mother relating to the biological father. N.B. does not need to establish his parental rights pursuant to this article, as they have long been established.

N.B. took action to enforce his visitation rights by filing his contempt motion in January 2020, which was not heard until May 2021. While the contempt motion was filed in the Fifteenth Judicial District Court and the trial court in this matter declined to allow the Fifteenth Judicial District Court's judgment into evidence at the September 21, 2021 Zoom hearing, we consider all evidence relevant to the best interest of the children. La.Code Evid. art. 1101(B)(2); *C.M.J. v. L.M.C.*, 14-1119 (La. 10/15/14), 156 So.3d 16.

Louisiana Code Evidence article 1101(B)(2) provides:

B. Limited applicability. Except as otherwise provided by Article 1101(A)(2) and other legislation, in the following proceedings, *the principles underlying this Code shall serve as guides to the admissibility of evidence*. The specific exclusionary rules and other provisions, however, shall be applied only to the extent that they tend to promote the purposes of the proceeding.

. . . .

24

(2) Child custody cases.

(Emphasis added).

Although La.Code Evid. art. 1101(B)(2) applies to child custody cases, we find the same rationale applies, even more so, to an intrafamily adoption. While this issue appears res novo, a relaxed evidentiary standard has been applied in instances other than child custody proceedings such as when a parent filed an order of protection against the other parent. *See S.L.B. v. C.E.B.*, 17-978, 17-979, 17-980 (La.App. 4 Cir. 7/27/18), 252 So.3d 950, *writ denied*, 18-1442 (La. 11/20/18), 256 So.3d 992. In *S.L.B.*, the court stated:

> although this is not a child custody case, our jurisprudence indicates that, with respect to child custody cases, there is "a relaxed evidentiary standard . . . used to advance the purposes of the custody proceeding" because "the Louisiana legislature has concluded that the best interests of children are not served by strict application of the rules of evidence." *Bowden v. Brown*, 48,268, p. 17 (La. App. 2 Cir. 5/15/13), 114 So.3d 1194, 1205. We see no reason why this principle is not applicable to this matter.

*Id.* at 966. *See also, Sorrells v. Sorrells*, 15-500 (La.App. 3 Cir. 11/4/15), 178 So.3d 288.

The same rationale applies here. To disregard the only expert testimony given in this case, along with a finding of contempt of the mother for thwarting N.B.'s efforts to see his children, ignores highly relevant facts and leaves the factfinder short on important information necessary for determining the best interests of the children.

In *In re R.W.T. Applying for Adoption of J.D.*, 594 So.2d 1383, 1389 (La.App. 2 Cir. 2/26/92)(emphasis added), the appellate court noted with approval the trial court's determination that the "best interest of the child is broad enough that the court should have the *benefit of all the information it can get with respect to any*

25

*relationship between the child and the natural parent*." In *In re R.W.T.,* this related to post-petition events involving the natural father.

Accordingly, we will consider all of the proffered evidence in determining the best interests of the children.

Whether N.B. was prevented from exercising his custodial rights is highly relevant to a petition for intrafamily adoption in which the petitioner claims the natural father failed to visit his children for more than six months. Moreover, it is highly relevant in determining the best interests of the children. Additionally, the only expert witness that interviewed the children and had the benefit of witnessing the children with their father and determining the nature of the relationship between the father and the children is also highly relevant.

Moreover, N.B. does not dispute that the children are in a stable home environment. He is not seeking domiciliary custody of the children, but rather only to remain their legal father and exercise his visitation rights. There is simply no evidence in the record that these children would benefit from the removal of their father from their lives.

As noted by N.B., the facts of this case are similar to those in *Latiolas,* 376 So.2d 555, except even more indicative that terminating N.B.'s rights would not be in the children's best interest. In *Latiolais*, the supreme court affirmed the court of appeal's finding that consent was not required due to a failure to pay child support, but that it was not in the child's best interest to have her father's rights terminated because the record contained no evidence as to how rupturing the father-child relationship would be in her best interest. The child was three years old when the parents divorced and nearly ten years old when the petition was filed. The father exercised visitation and the child had a strong relationship with the father's family.

We agree that putting an "irrevocable end" to the long-standing relationship N.B. has with his three children would not benefit them and may, in fact, harm them. *Latiolais,* 376 So.2d at 560. Moreover, a factfinder has already determined that N.B.'s failure to visit his children was due to a concerted effort by W.P.H. and J.H. to deny N.B. his court-ordered visitation. Additionally, while J.H. and W.P.H. make a lot of complaints about N.B.'s "morals," there simply was no evidence that N.B. ever compromised his children's safety or in any other way harmed them. The sum of the complaints that J.H. had about N.B. regarding the children was that he lied about sending gifts. Otherwise, the bulk of J.H.'s complaints were marital disputes between J.H. and N.B. that were unrelated to the children.

Moreover, it is clear from testimony that the children loved their father, missed him, and wanted to continue seeing him. There is no evidence that severing N.B.'s parental rights was necessary "to protect the [children] from physical or psychological harm." *In re K.L.H.*, 771 So.2d 706 at 710. On the contrary, the trial court's ruling was erroneously based on a finding of a preferential household. W.P.H. simply failed to prove that it would be in the best interests of the children if their father's parental rights were terminated.

For these reasons, we find the trial court manifestly erred in finding that W.P.H. met his burden of proving that it would be in the best interest of the children to terminate N.B.'s rights. Accordingly, we reverse the trial court's judgment terminating N.B.'s parental rights.

## CONCLUSION

The judgment of the trial court granting the intrafamily adoption in favor of W.P.H. and terminating N.B.'s parental rights to his three children, A.A.B., E.J.B., and G.K.B., is reversed. All costs of this appeal are assessed to W.P.H.

**REVERSED AND RENDERED**.

27